Argued and submitted January 9; conviction for aggravated murder affirmed in part and reversed in part; sentence of death vacated, and case is remanded to the circuit court for further proceedings September 17, 1992, reconsideration allowed by order January 26, 1993

See 314 Or 511, 840 P2d 691 (1992)

## STATE OF OREGON,
*Respondent,*

*v.*

## ROBERT PAUL LANGLEY, JR.,
*Appellant.*

## (CC 88-C-21624; SC S36746)

839 P2d 692

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause and filed the brief and reply brief for appellant. Also on the briefs were Sally Avera, Public Defender, and Stephen J. Williams, Deputy Public Defender, Salem. Robert Paul Langley, Jr., *pro se*, filed a supplemental brief.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Diane S. Lefkow and Janet A. Metcalf, Assistant Attorneys General, Salem.

CARSON, C. J.

Fadeley, J., dissented and filed an opinion.

## CARSON, C. J.

This case comes before this court on automatic and direct review of a judgment of conviction and sentence of death. ORS 163.150(1)(g). Defendant seeks reversal of his conviction on 16 counts of aggravated murder related to the 1987 death of Anne Gray. Alternatively, he requests that his sentence of death be vacated.

Defendant presents several assignments of pre-trial error, seven assignments of error regarding the guilt phase of his trial, and three assignments regarding the penalty phase. We find no reversible error in the pre-trial phase, and, with one exception, no error in the guilt phase. We affirm all but one of defendant's convictions. We vacate the sentence of death and remand the case to the circuit court for further proceedings on the penalty phase.

## I. FACTS

Because the jury found defendant guilty, we review the facts in the light most favorable to the state. *State v. Williams*, 313 Or 19, 21, 828 P2d 1006 (1992).

At the time Gray was murdered, defendant was a prison inmate who lived in a cottage on the grounds of the Oregon State Hospital in Salem while he participated in a residential Correctional Treatment Program (CTP) for mentally and emotionally disturbed inmates. The CTP in which defendant was enrolled is a transition program in which a mentally or emotionally disturbed inmate, nearing the end of a prison term, receives extensive psychological counseling, learns job and independent living skills, and is assisted in establishing a productive life in the community.

Defendant entered the program in April 1986, after having served approximately 13 years in prison. With the exception of a two-week period in November 1986 during which defendant was returned to prison to "re-evaluate his commitment to treatment," he remained in the program until April 1988. As his integration into the community progressed during late 1987, defendant left the hospital grounds regularly on lengthy, unsupervised passes. Defendant was required to list planned activities for each pass and

to keep a detailed journal, but program personnel did not otherwise monitor his conduct.

During the fall of 1987, defendant attended a job search class in Salem. There he met a woman named Sacha Thayer. Thayer became defendant's girlfriend and later introduced defendant to Gray. Gray lived alone in an apartment adjacent to Thayer's. Defendant often visited Thayer and Gray. Both women knew that defendant was an inmate re-entering the community through the treatment program.

Gray disappeared on December 10, 1987. Defendant acknowledges being the last person known to have seen her alive. He arrived at Gray's apartment shortly after 4:00 a.m. that day, allegedly to iron out details of an agreement that he claims to have had with Gray to sell all Gray's possessions so that she could go into hiding. Defendant claims that, sometime after 7:00 that morning, Gray left her apartment to go to Portland with an unidentified woman and that defendant remained in the apartment alone. According to defendant, Gray had confided in him several days earlier that she intended to leave town on the 10th and that a trip to Portland was to be the first step toward her purposeful disappearance. Gray had not mentioned a plan to disappear to anyone else. Her family, her friends, her employer, and her landlord were surprised and worried about her sudden disappearance.

In the days preceding Gray's disappearance, defendant had drawn a contract memorializing an alleged agreement for him to sell all Gray's possessions on a consignment basis. He had arranged for Thayer to witness the signing of that contract before Thayer left for work on the morning of December 10. At defendant's request, Thayer never discussed with Gray either the contract or the plan to disappear. When Thayer arrived at Gray's apartment that morning, what appeared to be Gray's signature already was affixed to the contract.[1] While she was in Gray's apartment, Thayer neither saw nor heard Gray, but did note that the bedroom door was ajar and water was running in the bathroom. Defendant explained to Thayer that Gray was in the apartment but did not want to be seen.

---

[1] According to a handwriting expert's testimony at trial, Gray's signature was forged.

During the evening of December 10, Thayer took her automobile, at defendant's direction, to meet defendant outside the apartment building where Thayer and Gray lived. Thayer and another neighbor saw defendant carrying a heavy, awkward bundle, wrapped in Gray's comforter, from Gray's apartment to Thayer's automobile. Thayer drove defendant to the home of Winona McCoy, defendant's aunt. Defendant then removed the heavy bundle from the automobile and carried it to McCoy's backyard. Twenty minutes later, defendant, his shoes and clothing covered with mud, returned to Thayer's automobile, carrying only Gray's then-muddy comforter. Several days later, police questioned defendant about the circumstances of Gray's disappearance but took no further action against defendant at that time.

Gray's decomposed body was discovered on April 15, 1988, in a shallow grave in McCoy's backyard. According to the medical examiner, Gray died of asphyxiation. Her body was very tightly bound in the fetal position by ten different bindings, including duct tape wrapped around her head to cover her nose and mouth, a shoestring-type ligature knotted tightly around her neck, and numerous bandages, tapes and ropes tied around her wrists, ankles, torso, and legs. Gray's asphyxiation was caused by both the neck ligature and the duct tape covering her nose and mouth.

The discovery of Gray's body followed by one day the discovery of the severely beaten and bound body of Larry Rockenbrant, another acquaintance of defendant's, in a shallow grave behind the Oregon State Hospital cottage in which defendant lived.[2] Following a highly publicized trial, defendant was convicted of Rockenbrant's murder and sentenced to death. Because of the prosecutor's theory that defendant had killed Rockenbrant to prevent Rockenbrant from implicating defendant in the murder of Gray, evidence of Gray's disappearance and homicide was presented in defendant's trial for the Rockenbrant murder and was reported in the local newspaper.

___

[2] After defendant fled from the state hospital on April 14, his cousin, Jone McCoy, had become suspicious and contacted police about the hole that defendant had dug in the McCoy backyard the previous winter. Police discovered Gray's body in the location where Jone said that defendant had dug a hole in November or December 1987.

Of the 19 counts of aggravated murder for which defendant was indicted,[3] a Marion County jury found defendant guilty of 16.

Following a penalty phase in which the jury unanimously answered "yes" to all four questions posed by *former* ORS 163.150(1)(b),[4] the trial court entered a judgment by which defendant was convicted of aggravated murder and sentenced to death.

## II. PRE-TRIAL PHASE
## ASSIGNMENTS OF ERROR

### A. *Mitigation Investigator*

■ Defendant assigns as error the trial court's denial of his request for the expenses of a special investigator and expert on mitigating evidence in death penalty cases. Defendant argues that lack of a mitigation expert denied his statutory rights and his state and federal constitutional rights. We first address his statutory right to an expert. *State v. Kennedy*, 295 Or 260, 666 P2d 1316 (1983).

Defendant was indigent at the time of his trial. Indigent defendants are entitled by statute to certain trial-related expenses:

---

[3] All counts accused defendant of the aggravated murder of Gray. Count I alleged intentional torture; Count II alleged that, at the time of the murder, defendant was confined in a correctional facility; Count III alleged that, at the time of the murder, defendant was "otherwise in custody"; the remaining counts alleged that the murder occurred in the course of particular felonies.

[4] The instructions included these four questions:

"(1) Was the conduct of the defendant that caused the death of Anne Louise Gray committed deliberately and with the reasonable expectation that the death of Anne Louise Gray would result?

"* * * * *

"Question 2. Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

"Question 3. Was the conduct of the defendant in killing Anne Louise Gray unreasonable in response to the provocation, if any, by Anne Louise Gray?

"Question 4. Considering the extend [*sic*] to which the defendant's character and background and circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, should a sentence of death be imposed?"

"The person for whom counsel has been appointed is entitled to reasonable expenses for investigation, preparation and presentation of the case. The person or the counsel for the person may upon motion, which need not be disclosed to the district attorney prior to conclusion of the case, secure approval and authorization of payment of such expenses as the court finds are necessary and proper in the investigation, preparation and presentation of the case, including but not limited to * * * necessary costs associated with obtaining the attendance of witnesses for the defense, [and] expert witness fees * * *." ORS 135.055(3).

The appropriate inquiry on appeal is whether the trial court abused its discretion in determining what was necessary and proper in the circumstances of this case. *State v. Rogers*, 313 Or 356, 366, 836 P2d 1308 (1992).

Defendant describes a mitigation investigator as "an individual who specializes in compiling potentially mitigating information about the accused in a capital case," noting that "[i]t is a relatively new area of expertise, developed to aid capital defendants in presenting favorable evidence to the factfinder in the penalty phase of the trial." More than one-half the amount requested for expenses was for the investigator's travel to and from her out-of-state office. The affidavit did not explain why one of the local investigators assigned to assist defendant could not search out and present mitigating evidence nor why the peculiar expertise of the specialized investigator was necessary to the preparation or presentation of defendant's case. The trial court did approve defendant's other requests for investigators and expert witness fees, and its denial of this request was reasonable in light of the limited justification that defendant provided. The trial court did not abuse its discretion.

Defendant did not raise any objections based on alleged constitutional infirmity before or during trial, nor is an error of law apparent on the face of the record. ORAP 5.45(2); *see State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990) (discussing requirements for satisfying ORAP 5.45(2)). We will not consider the constitutional objections for the first time on appeal. ORAP 5.45(2); *see State v. Walton*, 311 Or 223, 240-41, 809 P2d 81 (1991) (declining to consider constitutional argument not raised in trial court).

## B. Demurrer

Defendant's demurrer raised 25 issues concerning constitutionality of the indictment.[5] All but two of those have been rejected by this court in previous death penalty appeals. We address the two unresolved issues, each of which challenges ORS 163.095(2)(b) as unconstitutionally vague.

ORS 163.095 defines aggravated murder as "murder committed under, or accompanied by, any of the following circumstances." Among listed aggravating circumstances is this one:

> "The defendant was confined in a state, county or municipal penal or correctional facility or was otherwise in custody when the murder occurred." ORS 163.095(2)(b).

Defendant asserts that both "confined" and "otherwise in custody" are vague in the following respects:

> "Defendant submits that this statute is vague and in violation of the state constitutional protections of fair notice (Article I, section 11), proportionality (Article I, section 16), privileges and immunities (Article I, section 20), and the protection against *ex post facto* laws (Article I, section 21). The statute also violates the vagueness, due process, equal protection and privileges and immunities guarantees of the Fourteenth Amendment of the United States Constitution."

■ ■ Defendant's chief argument is that, because the terms "confined" and "otherwise in custody" are not defined by statute, they fail to give adequate notice of forbidden conduct. The vagueness standard under the Oregon Constitution was set out by this court in *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985):

---

[5] Defendant's supplemental *pro se* brief also raises other arguments challenging the constitutionality of the death penalty sentencing scheme. Those arguments relate to the sentence of life imprisonment without the possibility of parole. *See* ORS 163.150(2) (following negative jury finding on death penalty, trial court shall sentence defendant to life without possibility of parole unless 10 or more jurors find mitigating circumstances sufficient to warrant life imprisonment). We need not address defendant's arguments because the "life without parole" option was added to the statutory scheme in 1989; in any new penalty phase proceeding, defendant will be sentenced under the statutory scheme in force in 1987 or 1988, when the crime was committed. *See State v. Isom*, 313 Or 391, 395, 837 P2d 491 (1992) ("It is clear * * * that the legislature intends that Oregon courts sentence criminal defendants under the statutory scheme in force when a particular criminal act was committed.").

> "The terms of a criminal statute must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties. *State v. Hodges*, 254 Or 21, 27, 457 P2d 491 (1969). In addition to its function of giving fair notice of the forbidden conduct, [a] criminal statute must not be so vague as to permit a judge or jury to exercise uncontrolled discretion in punishing defendants, because this offends the principle against *ex post facto* laws embodied in Article I, section 21, of the Oregon Constitution. *Id*. The equal privileges and immunities clause [footnote omitted] is also implicated when vague laws give unbridled discretion to judges and jurors to decide what is prohibited in a given case, for this results in the unequal application of criminal laws. *See State v. Robertson*, 293 Or 402, 408, 649 P2d 569 (1982). A criminal statute need not define an offense with such precision that a person in every case can determine in advance that a specific conduct will be within the statute's reach. However, a reasonable degree of certainty is required by Article I, sections 20 and 21."

Absolute certainty is not required; only a *reasonable* degree of certainty is required. This court reiterated that standard in *State v. Cornell/Pinnell*, 304 Or 27, 29-30, 741 P2d 501 (1987), by stating:

> "A statute need not define an offense so precisely that, in every case, a person can determine the specific conduct that will fall within that statute's reach, but a reasonable degree of certainty is required by Article I, sections 20 and 21."

■ Defendant argues that the statute is ambiguous because it is unclear whether, being on pass in the community at the time of Gray's murder, he was "confined." We conclude that the term was sufficiently unambiguous to permit us to hold, as a matter of law, that defendant was *not* "confined" at the time of the murder, because he was on a pass rather than in an institution. The term "confined" refers to actual physical restraint. "Confined" is not unconstitutionally vague.

■ Defendant also argues that "otherwise in custody" is unconstitutionally vague. The terms "confined" and "otherwise in custody" are juxtaposed in the statute. Context is important in determining statutory meaning. *See generally State ex rel Davey v. Frankel*, 312 Or 286, 290, 823 P2d 394 (1991) (analyzing both text and context of ambiguous statutory language). Given the context here, there is no ambiguity.

Simply said, a defendant who is in the custody of a penal or correctional facility but who is not physically confined therein is "otherwise in custody." This reading is consistent with the accepted rule of statutory construction that words of common usage be given their plain, natural, and ordinary meaning. *See Perez v. State Farm Mutual Ins. Co.*, 289 Or 295, 299, 613 P2d 32 (1980) (stating rule). It is also consistent with the definition of "custody" in the context of escape.[6]

We conclude that both challenged terms are reasonably certain, even though their application to a particular fact situation occasionally may be difficult. *See State v. Nefstad*, 309 Or 523, 540, 789 P2d 1326 (1990) (even commonly used and readily defined words may be difficult to apply). There was no error in the trial court's denial of defendant's demurrer.[7]

### III. GUILT-PHASE ASSIGNMENTS OF ERROR

*A. Appointment of Substitute Appointed Counsel*

■ Defendant asserts that the trial court erred when it denied his motion for appointment of new counsel. Defendant's motion was presented on the first day of trial, just before jury selection was to begin. At that point, two court-appointed lawyers had represented defendant for nearly one year.

Defendant told the court that he no longer could work with his lawyers and chose to represent himself. The

---

[6] The 1971 legislative commentary juxtaposed actual and constructive restraint:

" 'Escape' is defined * * * as the unlawful departure of a person from custody or a correctional facility. *The definition of 'custody' refers expressly to both actual and constructive restraint.* * * * It has been argued that since some situations involve no actual restraint, *e.g.* work release programs, temporary leave, the actor's unauthorized departure from the limits of his liberty did not constitute an escape. This draft rejects that view." Legislative Commentary to 1971 Oregon Criminal Code, ORS 162.135 (emphasis added).

"Confined" is analogous to what the 1971 legislature called "actual restraint," while "otherwise in custody" is analogous to what the 1971 legislature called "constructive restraint."

[7] Defendant's challenge to the term "confined" is further discussed *infra* in Part III.E.; the state conceded that defendant was not "confined" at the time of the murder.

trial court appointed a third independent lawyer to advise defendant about the ramifications of a *pro se* defense and to assess defendant's complaints about his lawyers. The court gave defendant three options: present his own defense, present his own defense with the assistance of existing counsel, or continue to be represented by existing counsel. The court warned that, in any event, the trial would not be delayed. After considering the advice of the independent lawyer, defendant chose to continue to be represented by his appointed counsel but, nonetheless, presented a written motion for substitution of appointed counsel. The trial court denied the motion.

Defendant's motion complained of what he called "intentional ineffective assistance of counsel" during an unrelated pre-trial habeas corpus challenge at which he was represented by the same lawyers. He explained:

> "Defendant during his state habeas corpus hearing was not allowed to put on all of his evidence and was lied to and manipulated by his attorneys in order to keep this evidence out of the proceedings. His attorneys did not discuss defense strategy nor go over the defendants [*sic*] testimony before his taking the stand."

Defendant also asserted that there was an "attitude of animosity" between him and his lawyers because of his dissatisfaction with them.

A court of competent jurisdiction "may substitute one appointed counsel for another at any stage of the proceedings when the interests of justice require such substitution." ORS 135.050(5). However, a defendant has "no right to have another court-appointed lawyer in the absence of a legitimate complaint concerning the one already appointed for him." *State v. Davidson*, 252 Or 617, 620, 451 P2d 481 (1969).

■ Under *Davidson*, assessment of a defendant's request for substitution of counsel requires a factual assessment of whether the complaint is "legitimate." The trial court made such an assessment and found that defendant's complaints did not require substitution of counsel.[8] Although

---

[8] The trial court explained its denial of defendant's motion:

"[T]he reasoning behind my denial of the motion to appoint new counsel is pretty basic. Court-appointed counsel are just that, and the public expense has

this court has not before established the appropriate standard of review for a trial court's denial of a criminal defendant's motion for substitution, we conclude, as has the Court of Appeals, *State v. Heaps*, 87 Or App 489, 742 P2d 1188 (1987), that review should be for abuse of discretion.

■■■■ A "legitimate complaint" about a court-appointed lawyer is one that is based on an abridgement of a criminal defendant's constitutional right to counsel.[9] The right to counsel requires adequate performance of an appointed lawyer's professional assistance. Defendant asserted that his lawyers were "ineffective." As this court has stated, "the term 'adequate' assistance of counsel may be more accurate than 'effective' assistance of counsel. Counsel cannot always be effective, but they must always be 'adequate' to the task." *Krummacher v. Gierloff*, 290 Or 867, 872 n 3, 627 P2d 458 (1981). It appears from the record that defendant's claim that his lawyers were ineffective (or inadequate) was based chiefly on his dissatisfaction with their choices of strategy. A simple loss of confidence or disagreement with counsel's approach to matters of strategy is not cause to substitute one appointed lawyer for another. *See* 2 LaFave and Israel, Criminal Procedure § 11.4(b) at 36-37 (1984) (stating rule and listing cases so holding).

---

been expended for better than 10 or 11 months now on [these counsel] to familiarize themselves with the case, to present it once, now are ready to present one of the parts again. If new counsel were to be appointed, then it would require · many weeks [sic] and perhaps months [sic] continuance, which this Court is not prepared to do considering the economic waste that would be involved.

"Also, one would wonder if a defendant utilizing court-appointed counsel were permitted to discharge that counsel without conflict of interest in the legal sense being expressed, then where would it stop? The newly appointed counsel would be subject to the same motion. And I suggest everything that I see as far as fairness to the people as well as fairness to the Defendant, to deny that motion. So there will be no new counsel appointed."

The trial court also addressed defendant's allegation of "ineffective" assistance of counsel, stating that there was

"nothing that's been presented to me this morning which would indicate that the actions of [counsel] are not reasonable under the circumstances[.]"

[9] Article I, section 11, of the Oregon Constitution provides:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel."

The Sixth Amendment to the Constitution of the United States provides:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

The trial court did not abuse its discretion in denying defendant's motion for substitution of counsel.

## B. Change of Venue

■ As is common in homicide cases, there was substantial pre-trial publicity about defendant, his victims, and his earlier murder trial. Defendant asserts that, because of the publicity, the trial court should have granted his motion for change of venue. Defendant asserts that the trial court's denial of his motion denied his right to a fair trial under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the Constitution of the United States.[10] Although it is our practice to address issues of state statutory and constitutional law before issues of federal constitutional law, *State v. Kennedy, supra,* defendant has offered no different analysis under the statute than under the state or federal constitutions, so we assume, without deciding, that the analysis is the same. *See State v. Rogers, supra,* 313 Or at 363, and *Dept. of Trans. v. Lundberg,* 312 Or 568, 573 n 4, 825 P2d 641 (1992) (making same assumption).

Defendant's motion for change of venue complained about local newspaper coverage during defendant's May-June 1989 trial for the Rockenbrant murder.[11] With his motion for change of venue, defendant submitted 10 articles from a local newspaper, chronicling that trial. Seven of those articles featured a photograph of defendant. Defendant also

---

[10] Article I, section 11, provides that, "[i]n all criminal prosecutions, the accused shall have the right to a public trial by an impartial jury * * *."

The Sixth Amendment, applicable to the states by the due process clause of the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

[11] Long before defendant's trial in this case, defendant filed, then withdrew, a motion for an order changing venue because of pre-trial publicity. Defendant's second motion for change of venue was filed October 23, 1989, mid-way through jury selection. The second motion was prompted by the October 22 publication of a purportedly inflammatory seven-page article about defendant in the *Northwest Magazine* section of *The Sunday Oregonian.* The second motion incorporated allegations from the first motion by reference, adding only allegations about the *Northwest Magazine* article. The effect of the *Northwest Magazine* article on the jurors is not at issue; extensive *voir dire* questioning revealed that none of the jurors had read the article or knew of its existence. At issue before this court is the publicity of which defendant complained in his first motion.

submitted an eleventh local article about prison overcrowding that featured a photograph of defendant, who was then on death row. The latest of the 11 articles submitted by defendant in support of his motion to change venue was printed more than three months before jury selection began in this case. The articles reported defendant's criminal history and opinions about his future dangerousness, as well as facts of both homicides and other details of defendant's earlier trial, conviction, and sentencing.

The trial court denied defendant's motion based on the standard for changing venue set out in ORS 131.355:

> "The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

We review denial of such motions for abuse of discretion. *State v. Little*, 249 Or 297, 312, 431 P2d 810 (1968).

Defendant asserts that this court implied in *State v. Little, supra*, 249 Or at 312, that "adverse publicity alone is an adequate ground for finding a trial court abused its discretion in refusing to move the place of trial." We reject such a broad reading of *State v. Little*. To the contrary, adverse publicity in a murder case is common and does not, of itself, necessarily make it impossible for a defendant to get a fair and impartial trial. *See State v. Rogers, supra*, 313 Or at 364-65 (pretrial publicity about facts of defendant's earlier murder trial not sufficient for change of venue).

In *State v. Little, supra*, this court cited an opinion of the Supreme Court of the United States, *Sheppard v. Maxwell*, 384 US 333, 86 S Ct 1507, 16 L Ed 2d 600 (1966), as a case in which news coverage was so prejudicial as to deprive a defendant of a fair trial. Defendant does not claim, nor do we find, that the publicity in this case was comparable to the inflammatory publicity in *Sheppard v. Maxwell, supra*, nor does he present evidence that denial of his motion for change of venue actually deprived him of a fair and impartial trial. Moreover, as the Supreme Court of the United States has stated, *Sheppard* and similar cases of extremely inflammatory publicity (*Estes v. Texas*, 381 US 532, 85 S Ct 1628, 14 L

Ed 2d 543 (1965), *Rideau v. Louisiana,* 373 US 723, 83 S Ct 1417, 10 L Ed 2d 663 (1963), and *Irvin v. Dowd,* 366 US 717, 81 S Ct 1639, 6 L Ed 2d 751 (1961)) "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy v. Florida,* 421 US 794, 799, 95 S Ct 2031, 44 L Ed 2d 589 (1975).

The trial court in this case presided over a lengthy and involved process of empaneling jurors. During *voir dire,* lawyers for both sides engaged in substantial questioning of potential jurors concerning their familiarity with publicity about defendant. The questioning revealed that four jurors recalled reading articles about defendant, although none of the four recalled much detail. Each of these four jurors was questioned about whether the juror could judge fairly. Each of the four was adamant that he or she held no preconceived notions of defendant's guilt or innocence and could decide the case based solely on the evidence presented at trial. Defendant passed each for cause. Defendant did not exhaust his peremptory challenges.

We conclude that, although some veniremen and some empaneled jurors were familiar with publicity about defendant, defendant was not thereby denied a fair and impartial trial. *See Patton v. Yount,* 467 US 1025, 1034-35, 104 S Ct 2885, 81 L Ed 2d 847 (1984) (if the passage of time has softened the effect of publicity on community and veniremen so that jurors once familiar with negative publicity no longer recall details and no longer hold opinions about a defendant, a defendant is not denied a fair trial).

The trial court determined that pretrial publicity was not prejudicial and that empaneled jurors would base their verdicts on the evidence.[12] That determination is entitled to great weight. *State v. Rogers, supra,* 313 Or at 364.

---

[12] As this court noted 80 years ago,

"A broad-minded intelligent citizen who has never acquired any impression either directly or indirectly about the issue to be tried would be an ideal juror; but in these days, when the means of communication through the press and otherwise is so extensive among the people, it would be impracticable to attain to this high standard for jurors in the administration of justice. * * * [An experienced trial judge] with the juror before him is far better qualified than the members of this court, with only the paper record at hand, to determine the ultimate question of whether or not the juror will disregard the previous opinion

The court's denial of defendant's motion for a change of venue was not an abuse of discretion.

## C. Evidence: Psychotherapist-Patient Privilege

At the time of the murder, defendant was participating in the state's corrections treatment program for mentally and emotionally disturbed penitentiary inmates. In the program, defendant was under the care and supervision of mental health professionals who treated his mental and emotional problems and helped him with the transition from prison life to freedom. As part of his treatment, he was required to prepare numerous written assignments. At trial, the state offered several of those written assignments as evidence. The written assignments at issue included a "treatment contract" (exhibit 1140), a "self-assessment" (exhibit 1141), an entry from defendant's "daily journal" (exhibit 1179), and a 13-page "life history" (exhibit 1297). The life history was offered during the penalty phase. All four documents were admitted over defendant's timely objection.

Defendant assigns as error the admission of those documents, which, he asserts, were confidential communications that should have been protected from disclosure by the psychotherapist-patient privilege. That privilege is set out in OEC 504(2):

> "A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."

The state contended at trial and contends before this court that the psychotherapist-patient privilege did not apply to the written assignments, because defendant was not a "patient," and because the members of defendant's treatment team for

he has formed, and fairly and impartially try the case within the meaning of the statute on that subject."

*State v. Humphrey*, 63 Or 540, 548, 128 P 824 (1912).

whom he prepared the assignments were not psychotherapists. The state has argued alternatively that, if the documents once were privileged, defendant had waived the privilege before the documents were admitted into evidence.

Determining whether a privilege applies to proffered evidence is a preliminary fact question decided by a trial court under OEC 104(1).[13] We review for errors of law the trial court's determination that no privilege applied in this case. The trial court admitted the exhibits over defendant's privilege objection without stating whether it concluded that no privilege existed or that defendant had waived the privilege. For the reasons set out below, we conclude that each of the documents at issue was privileged but that defendant waived the privilege. The trial court did not err in admitting them.

██ ██ Under the psychotherapist-patient privilege, a "patient" is "a person who consults or is examined or interviewed by a psychotherapist." OEC 504(1)(b). A "psychotherapist" is "a person who is * * * licensed, registered, certified or otherwise authorized under the laws of any state to engage in the diagnosis or treatment of a mental or emotional condition." OEC 504(1)(c). Defendant was a "patient" because he entered the program for treatment of a mental or emotional condition and consulted regularly with its psychotherapists as a part of his participation in the program. Whether, as asserted by the state, defendant was motivated to enter the program by a desire to leave prison more than by a desire to be treated is irrelevant; the salient fact is that, by entering the program, he sought and received treatment for a mental or emotional condition. The persons who assigned and reviewed defendant's written assignments while he was a patient in the program were members of the treatment team who were themselves "psychotherapists" or were agents of the "psychotherapists" (psychologists and psychiatrists) who led the team. *See State v. Miller*, 300 Or 203, 219, 709 P2d 225 (1985) (communications by patient to

---

[13] OEC 104(1) provides:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court * * *. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

persons associated with and acting under direction of a psychotherapist held privileged under OEC 504). Under OEC 504(2), the challenged documents, exhibits 1140, 1141, 1179, and 1297, were confidential communications between a patient and a psychotherapist. We conclude that, as a matter of law, the psychotherapist-patient privilege applied to each challenged document. We turn next to a determination of whether defendant waived the privilege.

An evidentiary privilege can be waived by the holder's voluntary disclosure to third parties. OEC 511 establishes that a holder of an evidentiary privilege "waives the privilege if the person * * * voluntarily discloses or consents to disclosure of any significant part of the matter or communication." The state argues that waiver occurred when exhibits 1140 and 1141 were admitted as evidence without objection during the Rockenbrant trial. In the alternative, the state argues, waiver occurred when, during cross-examination, defendant described the nature of assignments that he was required to complete as part of his treatment.

Before 1981, any testimony offered by a holder of privilege waived any communication that the holder had with any other person "on the same subject." *Former* ORS 44.040(2) *repealed by* Or Laws 1981, ch 892, § 98. There was unresolved inconsistency in this court's interpretation of the "on the same subject" language. *See Stark Street Properties v. Teufel*, 177 Or 649, 658 n 212, 562 P2d 531 (1977) (citing cases and commenting that interpretation of "same subject" depended on attitude of court toward policies behind privileges). In the medical treatment arena, this court held that once a patient intentionally offered testimony of one doctor, the privilege was terminated for all purposes related to that injury or illness. *State ex rel Calley v. Olsen*, 271 Or 369, 532 P2d 230 (1975). Adopted in 1981, OEC 511 substantially reduced the inconsistency. It limits the scope of waiver to "communications on the same subject with the same or other persons when *a significant part* of the privileged communication is voluntarily disclosed." OEC 511 (emphasis added).

On review of an OEC 104(1) ruling, this court accepts reasonable factual inferences that the trial judge could have made. *State v. Carlson*, 311 Or 201, 214, 808 P2d 1002 (1991). If the trial court does not make findings on

historical facts, this court presumes that the court found facts consistent with its final conclusion. *Id.* Exhibits 1140, 1141, and 1179 were contemporaneously offered into evidence during the testimony of defendant's treatment supervisor. Defendant timely objected to their admission, claiming that they were privileged. The state responded by stating, among other things, that "the documents have been previously — at least two of the documents have been admitted previously in another hearing [the Rockenbrant trial]." The state went on to answer defendant's objection to exhibit 1179 separately, making it clear from the context that the two documents to which the state referred as "admitted previously" were exhibits 1140 and 1141. This conclusion is buttressed by the fact that old numbered evidence stickers, which were stamped "admitted" and bore case numbers from the Rockenbrant trial, were conspicuously affixed to exhibits 1140 and 1141. Clearly, defendant's privilege was waived as to those exhibits.[14]

■ The second question before the trial judge was whether the exhibits admitted in the Rockenbrant trial disclosed "a significant part" of the communication revealed in the other documents, exhibits 1179 and 1297. Although the court did not state its reason for overruling defendant's objection and admitting the evidence, we infer that the trial court reasonably could have found that the privilege against disclosure had been waived by admission of exhibits 1140 and 1141 during defendant's earlier trial.

---

[14] Following oral argument, the state provided this court with that part of the Rockenbrant trial transcript that recorded the colloquy among court and counsel at the time documents now identified as exhibits 1140 and 1141 were admitted into evidence. The transcript reveals that the court permitted defense counsel a recess to review the documents before they were admitted and that defendant did not thereafter object to their admission. Disclosure, then, was voluntary, and the privilege was waived.

Defendant argues that this court may not consider the Rockenbrant transcript because it contains facts which may not be noticed on appeal. *See* OEC 201 (limiting judicial notice of adjudicative and legislative facts). We are not restricted by OEC 201, because the facts of which we take notice here are neither adjudicative nor legislative facts. Rather, the fact that there was no objection during the earlier trial is a fact relevant only to a purely legal preliminary evidentiary question.

Defendant was notified that the state offered the transcript and was given an opportunity to respond. *See* OEC 201(e) (party entitled to opportunity to be heard as to propriety of taking judicial notice). We considered defendant's response and are not persuaded by it.

Making journal entries such as the one recorded in exhibit 1179 was a required part of defendant's treatment program.[15] One purpose of the journal was to allow defendant and his therapists to reflect on defendant's thought processes in reaction to daily events, especially, we infer, those reflecting on his propensity to commit crimes. The "life history," exhibit 1297, recorded defendant's criminal history and his reflections on why he committed crimes. The subject matter of all four documents was the mental or emotional problems underlying defendant's tendency to commit crimes. A very significant part of that subject was disclosed in exhibits 1140 and 1141 when they were admitted in the Rockenbrant trial. For instance, exhibit 1140 included the following statement:

"I see my criminality as part of my power and control and manipulation patterns. I use calculating/compulsive thinking towards criminal/hurtful behavior that favors immediate self-gratification. My failure to resist these impulses is evidenced by my extensive criminal history. I use my criminality as a rebellious expression of autonomy to say * * * 'Im [sic] somebody and Ill [sic] do what ever I want to do whenever I want to do it[.]' It makes me feel like Im [sic] separate from everyone and gives me an experience of freedom and excitement. It also gives me the ability to not recognize anyone but myself. Its [sic] a major power thrust that exhilarates me and gives me a sense of being powerful and having independent control."

Exhibit 1140, the "treatment contract," went on to describe the detailed thought process that preceded defendant's antisocial conduct. Although the journal entries were less detailed and the life history more detailed than the quoted exhibit, their subject matter was the same and a significant part of that subject matter was disclosed when exhibits 1140 and 1141 were admitted during the earlier trial. Defendant's privilege to keep the communications confidential was waived.

---

[15] The nature of journal entries was described at trial by defendant's treatment supervisor:

"The journals are something that's expected of all people that are in treatment at MED [the mentally and emotionally disturbed treatment program], and they are designed to have the individual do some self reflection on a daily basis in terms of how their day has been, what significant events have happened, significant thinking that they have had about the day or any particular incidents that have been of meaning to them during the course of the day. The journals are regularly reviewed by a staff person at MED."

We need not reach the state's argument that defendant waived his privilege by describing on cross-examination the nature of written assignments that he prepared in treatment. The privilege had been waived before the trial began.[16]

## D. Torture

■ Defendant assigns as error the denial of his motion for a judgment of acquittal on Count I, the charge of murder in the course of intentional torture. ORS 163.095(1)(e) defines the elements of the charge:

" '[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"'* * * * *

"(e) The homicide occurred in the course of or as a result of intentional maiming or torture of the victim."

The torture provision of the aggravated murder statute was construed in *State v. Cornell/Pinnell, supra,* 304 Or at 31-32 (1987):

"[O]ne can conclude that the legislature's purpose in enacting ORS 163.095(1)(e) was to elevate the punishment for murder when the perpetrator also separately intended to inflict intense physical pain upon an unwilling victim. * * *

"Not every infliction of intense physical pain, even through an intentional act known by the actor to be intensely painful, qualifies as 'torture.' The act must be intentional, of course, but the word 'torture' itself connotes that the infliction of pain is one reason for the defendant's intentional act. To utilize the statute, the state must prove that the perpetrator had this objective apart from responsibility for the death of the victim." *Id.* (footnote omitted).

Defendant asserts that the prosecution presented insufficient evidence to establish the torture charge. We review questions of sufficiency of evidence in a criminal case,

---

[16] Although we are not bound by the legislative commentary prepared by the drafters of the Oregon Evidence Code, we recognize it as useful background. *State ex rel Davey v. Frankel,* 312 Or 286, 293 n 5, 823 P2d 394 (1991); *State v. McClure,* 298 Or 336, 344, 692 P2d 579 (1984). On point in this case is the unofficial legislative commentary to OEC 511, which states, "once confidentiality is destroyed through voluntary disclosure, no subsequent claim of privilege can restore it." Kirkpatrick, Oregon Evidence 282 (2d ed 1989) (Legislative Commentary to OEC 511 (quoting commentary to Federal Rule of Evidence 511)). We agree.

following conviction, by examining the evidence in the light most favorable to the state and determining whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt. *State v. Walters*, 311 Or 80, 804 P2d 1164 (1991).

 Gray died by asphyxiation. Although the two medical witnesses testified that death by asphyxiation takes three to five minutes and is painful, we agree with defendant that evidence of intentional asphyxiation is not, in and of itself, evidence of torture, *i.e.*, an intent to inflict intense physical pain. Absent other circumstances, murder by asphyxiation is not substantively different than murder by stabbing or shooting or bludgeoning. In each instance, the victim may well suffer several minutes of pain and terror before succumbing. The focus of a torture inquiry is not on the defendant's intent to cause the victim's death, but on the defendant's separate intent to cause intense physical pain. *State v. Cornell/Pinnell, supra.*

Although evidence that defendant purposely blocked Gray's airways was insufficient to reach a guilty verdict on the torture count, we conclude that the jury was presented with a sufficient quantity of other evidence of defendant's intent to inflict intense physical pain that we must affirm.

Gray's body was very elaborately bound in a tight fetal position by ten separate ropes, bandages, and lengths of tape, all carefully tied and knotted so that she could not move at all. Her mouth was covered by adhesive tape, then duct tape was wrapped three times around her head. Defendant's own medical expert testified that, if the bindings had been applied while Gray was alive, they would have been painful. A rational factfinder could reasonably infer that the bindings were applied while Gray was alive and that the number and tightness of the bindings was far beyond what would have been necessary to further an intent to prevent her escape. A rational factfinder further could have inferred that defendant applied the bindings with an intent to cause and maintain intensely painful muscle cramping.

Another reasonable inference that a rational factfinder could have made is that defendant purposely kept Gray

tightly bound for a lengthy period of time with the intent that she suffer unrelieved and steadily escalating pain. Defendant arrived at Gray's apartment before 5 a.m.; he invited Thayer in sometime before 7:30. While Thayer was there, she neither saw nor heard Gray, but did note that defendant claimed that Gray was in the bathroom, where enough water was running to muffle sounds. A rational factfinder could have inferred that, when Thayer arrived, Gray was bound and gagged, alive, and in intense pain. Defendant took a heavy bundle, which was apparently Gray's body, out of the apartment sometime after 5:30 p.m. Jurors could have inferred that defendant intended to keep Gray alive and suffering intense physical pain before he killed her.

There was sufficient evidence for a rational factfinder to find beyond a reasonable doubt that defendant intended to inflict intense physical pain on Gray before asphyxiating her. Accordingly, we affirm defendant's conviction of aggravated murder in the course of torture.

*E. Aggravating Factor of Confinement in Correctional Facility*

Defendant argues, and the state agrees, that he should have been acquitted of charges that he murdered Gray while he was confined in an Oregon correctional facility. The murder occurred while defendant was on a pass away from the Oregon State Hospital. Although he was "otherwise in custody" as alleged in another count of the indictment, he was not "confined." The court erred by denying defendant's motion for acquittal on the count alleging confinement. Defendant's conviction of aggravated murder for murder committed while confined in an Oregon correctional facility is reversed.

Defendant's remaining aggravated murder convictions are affirmed.

## IV. PENALTY-PHASE ASSIGNMENTS OF ERROR

The trial in this case took place from October to December 1989, a time when capital sentencing procedure was in metamorphosis. In 1988, in *State v. Wagner*, 305 Or 115, 752 P2d 1136 (1988) (*Wagner I*), this court considered

the constitutionality of death penalty jury instructions and found that the three instructions mandated by statute allowed sufficient consideration of mitigating evidence. The three instructions required by ORS 163.150(2) at that time and approved in *Wagner I* were:

> "(a) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

> "(b) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In determining this issue, the court shall instruct the jury to consider any mitigating circumstances offered in evidence, including but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed; and

> "(c) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." 305 Or at 121.

Wagner appealed to the Supreme Court of the United States. In July 1989, that court vacated the judgment and remanded the case to this court "for further consideration in light of *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989)." *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

In June of 1989, the United States Supreme Court decided the landmark case of *Penry v. Lynaugh, supra. Penry* held that, before the death penalty could be imposed, the federal constitution required jury consideration of "any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime" and required a separate, fourth instruction "informing the jury that it could consider and give effect to the mitigating evidence." 492 US at 328, 109 S Ct at 2951, 106 L Ed 2d at 284. Oregon's death penalty instructions were based on the Texas statutory death penalty instructions at issue in *Penry*.

In response to *Penry*, which was decided in the waning days of Oregon's 1989 legislative session, the legislature passed a statutory "fourth question":

> "If constitutionally required, considering the extent to which the defendant's character and background and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed." *Former* ORS 163.150 (1)(b)(D) (1989).

That provision became effective July 24, 1989. Or Laws 1989, ch 790, § 135b.

At the close of the penalty phase of defendant's trial in this case, this court had not yet reconsidered *State v. Wagner, supra*, so the trial court had no guidance for a mitigation instruction other than the statute and *Penry* itself. Although defendant excepted and submitted alternate instructions,[17] the trial court gave the following jury instruction:

> "Considering the extend [*sic*] to which the defendant's character and background and circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, should a sentence of death be imposed?"

The trial court also instructed the jury as follows:

> "In answering these four questions you are to consider any mitigating circumstances received in evidence including by not — but not limited to the defendant's age and the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed."

---

[17] Defendant requested that the following "fourth question" be given to the jury:

> "Considering all of the mitigating evidence, including but not limited to the defendant's background, character, and the circumstances of the offense, should Robert Paul Langley, Jr. be sentenced to death rather than to life in prison?"

Defendant excepted to the court's instruction and requested in the alternative the instruction proposed by Justice Gillette's dissent in *State v. Wagner*, 305 Or 115, 233, 752 P2d 1136 (1988), *viz.*, "After considering all the mitigating evidence, does the jury still unanimously conclude that the prisoner should be put to death, rather than spared?"

Several weeks after defendant was sentenced to death, this court revisited the issue of the constitutionality of Oregon death penalty instructions in *State v. Wagner,* 309 Or 5, 786 P2d 93 (1990) (*Wagner II*). The court held in *Wagner II* that the language of *former* ORS 163.150(1)(b)(D) was grammatically unclear and required a translation into an intelligible jury instruction in order for the sentencing process to be constitutionally effective. 309 Or at 18. The court went on to suggest an intelligible mitigation instruction consistent with constitutional and statutory standards that might be phrased in the following language:

> "Should defendant receive a death sentence? You should answer this question 'no' if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death." 309 Or at 19.

The court also stated:

> "We do not believe that mitigation evidence can be practicably limited to items 'causally related' to the crime and we conclude that all aspects of a defendant's character and background are 'relevant to sentence,' *i.e.*, the jury's exercise of a reasoned moral response to the question 'should defendant receive a death sentence?' " *Id.*

Not only did the trial court below repeat statutory language, which this court later held to be incomprehensible, it also failed to give an instruction clearly allowing the jury to consider mitigating evidence not causally related to the crime. For these reasons, the instructions were constitutionally inadequate, and we must vacate defendant's sentence of death.[18]

## IV. CONCLUSION

The judgment of conviction is affirmed, except as to Count II, which is reversed. The sentence of death is vacated. Assignments of error not discussed herein have been considered but are found to be unpersuasive. The case is remanded to the circuit court for further proceedings consistent with this opinion.

---

[18] Having vacated defendant's death sentence, we need not address defendant's other penalty-phase assignments of error.

**FADELEY, J.,** dissenting.

I dissent for the reason stated in the first three paragraphs of the dissenting opinion in *State v. Williams*, 313 Or 19, 44-45, 828 P2d 1006 (1992).

Specifically, the homicide in this case occurred at a time when the Oregon statute did not meet federal constitutional muster. The Supreme Court of the United States vacated the sentence and remanded a death penalty case to this court in *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). Thereafter, this court, by a majority vote, added 100 words to the statute in an effort to save it from the constitutional infirmity. *See State v. Moen*, 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting, detailing the 100-word addition to statute). The statute had been initiated and adopted in 1984. This court had no authority to make a substantial, significant, and after-the-fact addition to the 1984 statute that the people, by their vote adopting it, did not include. Thus, the majority has affirmed a sentence based on judicial amendment to a penalty statute.

Only the legislative branch may enact penal laws. *State v. Isom*, 313 Or 391, 395, 837 P2d 491 (1992) ("the power of punishment is legislative"). I dissent.