



FILED

Feb 04 2026, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 25S-LW-50

## Anthony Wayne Carter,
*Appellant/Defendant,*

–v–

## State of Indiana,
*Appellee/Plaintiff.*

---

Argued: December 9, 2025 | Decided: February 4, 2026

Appeal from the Bartholomew Superior Court 1
No. 03D01-2304-MR-1927
The Honorable James D. Worton, Judge

---

**Opinion by Justice Molter**

Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**Molter, Justice.**

Anthony Carter appeals his murder conviction and sentence of life imprisonment without parole (LWOP). He raises two issues: (1) whether the trial court abused its discretion by declining to give a proposed lesser-included jury instruction on reckless homicide, and (2) whether sufficient evidence supported the jury's conclusion that the State proved the statutory torture aggravator. Finding no error, we affirm.

## Facts and Procedural History

Anthony Carter and his girlfriend Ashley Neville lived together at Neville's house in Columbus, Indiana. In the early morning hours of April 16, 2023, they were arguing over Carter's accusation of infidelity, which Neville denied. Neville ended the argument by going to bed.

Around 3:00 a.m., Carter entered the bedroom with a loaded handgun and said, "Alright, bitch, wake up. It's time to tell the truth." State's Ex. 93 at 30:00–30:25. He then shot Neville once on the left side of her head. Neville survived, so Carter strangled her with his hands for about thirty seconds, but still, she survived. Then, as Neville was "choking and snarling and gasping and gagging," Carter put a plastic grocery bag over her head and secured the bag over her face with several strips of duct tape. State's Ex. 7 at 1:13:40–1:14:00. Finally, he put a hand over her mouth to "intentionally cut off her airflow," which he claims was "to put her out of her misery." *Id.* at 1:14:20–1:14:30, 1:13:35–1:14:45.

Once Neville died, Carter covered her body and drove in Neville's car to Edinburgh, Indiana, to see his daughter. Around 5:30 a.m., his daughter called 911 to report that Carter told her he had killed Neville and did not regret it.

Shortly thereafter, officers arrived at Neville's house for a welfare check. The officers announced their presence and knocked on doors and windows, but they received no response. Later, officers obtained permission from the property owner to enter the house. They swept the residence but did not find Neville.

Meanwhile, Carter had driven back to Columbus. He parked Neville's car in a field and fled on foot into the woods. Eventually, officers found him hiding in the woods, took him into custody, and Mirandized him. He gave multiple recorded statements to police, which were played at trial. Initially, he told police that when he entered the bedroom to continue arguing with Neville, she pulled a gun out from under the covers and pointed it at him. He explained that he grabbed her hands to push the gun away, and the gun fired. He was worried that she was suffering after being shot, so he strangled her and taped a grocery bag on her head to put her out of her misery.

Later, Carter told an officer that Neville never had the gun. Instead, he brought the gun into the bedroom to intimidate her. He maintained, though, that the gun fired accidentally. He explained that, as he climbed onto the bed with Neville and placed his hands on either side of her head, the gun unexpectedly discharged.

The police sought and received a warrant to search Neville's house. There, officers found a large pile of clothes and laundry baskets on the bed. As they removed the clothes and baskets, they located Neville's body with the grocery bag still secured to her head.

Carter was charged with murder in April 2023. The State sought a sentence of life without parole, alleging three qualifying aggravators: (1) Carter was on probation for a felony conviction (intimidation) at the time of the murder; (2) he was on probation for a second felony conviction (invasion of privacy) at the time of the murder; and (3) he tortured Neville. *See* Ind. Code § 35-50-2-9(b)(9)(C), (b)(11)(A).

The jury trial began in October 2024. Carter's theory at trial was that he accidentally shot Neville and then hurried her death to end her suffering.

Neville's body was autopsied, and her cause of death was determined to be "the combined effects of a single gunshot wound to the head and asphyxiation." Tr. Vol. 2 at 181. Two coroners testified at trial. Both testified that Neville suffered two causes of death, although the second coroner concluded that Neville's primary cause of death was the gunshot wound.

In addition to the gunshot wound on the left side of Neville's head, the second coroner observed abrasions on Neville's back and forearm, damage to cartilage in Neville's neck consistent with pressure on the neck, and petechia—or burst blood vessels—on her cheeks consistent with asphyxiation. The coroner did not observe burn marks or stippling on Neville's body, which indicates the gun was most likely fired from at least three feet away from Neville.

The coroner added that the gunshot wound was not immediately fatal and that Neville was still alive and "likely breathing" after being shot. *Id.* at 194, 201. If Neville "had survived the gunshot wound to the head, the plastic bag around her head cut off all the oxygen that she could have had to her brain and her heart, and that killed her." *Id.* at 201. And, the coroner testified, it is possible Neville could have survived the gunshot wound if she had received immediate medical attention.

Before the close of trial, Carter proposed final jury instructions defining "reckless homicide," "recklessly," and "proximate cause." Relying on the second coroner's testimony, he argued the jury could conclude that the asphyxiation—Carter putting the bag over Neville's head—was not a proximate cause of Neville's death. If the jury concluded that the gunshot wound alone caused Neville's death and that the gunshot was accidental, Carter reasoned, the jury could conclude that he committed reckless homicide, not murder.

The trial court gave Carter's "recklessly" instruction, but it declined to give the other two. The court explained there was no serious evidentiary dispute as to Carter's state of mind that would justify giving a reckless homicide instruction. The second coroner's testimony that the gunshot wound was the primary cause of death made no difference, the court explained, because Carter admitted that he intentionally hastened Neville's death after he shot her:

> [Y]ou cannot ignore the second half, the bag, the tape. That cannot be ignored. And . . . [there is] no serious dispute that by his own statement . . . [Carter] wanted to quote unquote end her suffering. So regardless of whether or not we believe that,

still that intent is to end that life at that point. So we cannot ignore that second part of that. So there's no serious evidentiary dispute about that culpability at that point.

Tr. Vol. 3 at 66.

On October 28, 2024, the jury found Carter guilty of murder. During the penalty phase of trial, the State introduced evidence that Carter was convicted of two felonies (intimidation and invasion of privacy) in 2022 and was on probation for both offenses at the time of Neville's killing. Carter presented no evidence. He did not challenge the first two aggravators—that he was on probation for two felony convictions at the time of the murder—but argued he put the bag over Neville's head "to end her suffering," not "to torture her." *Id.* at 126–27. In the end, the jury found that the State proved the three charged aggravators beyond a reasonable doubt, found that the State proved the charged aggravators outweighed any mitigating circumstances, and recommended an LWOP sentence. The trial court accepted the jury's recommendation and imposed an LWOP sentence.

Carter then appealed his conviction and sentence directly to us, as "[w]e have mandatory, exclusive jurisdiction over criminal appeals in which the trial court imposes an LWOP sentence under Indiana Code section 35-50-2-9." *Crossland v. State*, 256 N.E.3d 517, 523–24 (Ind. 2025) (citing Ind. Appellate Rule 4(A)(1)(a)).

## Discussion and Decision

Carter raises two issues: (1) whether the trial court abused its discretion by declining to give his proposed lesser-included instruction on reckless homicide, and (2) whether sufficient evidence supported the jury's conclusion that the State proved the torture aggravator. We address each issue in turn and, finding no error, we affirm.

# I. The trial court did not abuse its discretion by declining to give Carter's proposed lesser-included instruction on reckless homicide.

Carter first challenges the trial court's decision not to give his proposed reckless homicide instruction, which decision this Court reviews for an abuse of discretion. *Washington v. State*, 997 N.E.2d 342, 345 (Ind. 2013).

To decide whether to instruct the jury on a lesser included offense to the crime charged, a trial court must engage in a three-part analysis. *Wright v. State*, 658 N.E.2d 563, 566–67 (Ind. 1995). At the first and second steps, the court compares the statute defining the crime charged with the statute defining the alleged lesser included charge to determine whether the alleged lesser included charge is (1) inherently included or (2) factually included in the crime charged. *Id*. If the alleged lesser included charge is neither inherently nor factually included, the court's analysis stops there; the court "should not give [the] requested instruction on the alleged lesser included offense." *Id.* at 567. But if the alleged lesser included offense is either inherently or factually included in the crime charged, the court proceeds to the third step and "look[s] at the evidence presented in the case by both parties." *Id.* "If there is a serious evidentiary dispute about the element . . . distinguishing the greater from the lesser offense and if, in the view of this dispute, a jury could conclude the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give" a requested instruction on the lesser included offense. *Id.*

Reckless homicide is an inherently included lesser offense of murder. *Webb v. State*, 963 N.E.2d 1103, 1106 (Ind. 2012). The only element distinguishing these two offenses "is the defendant's state of mind: reckless homicide occurs when the defendant recklessly kills another human being, and murder occurs when the killing is done knowingly or intentionally." *Id.* (quotations omitted). So the determinative issue here is whether the evidence presented at trial produced a serious evidentiary dispute as to Carter's state of mind.

Carter maintains there was a serious evidentiary dispute as to his state of mind that justified giving his proposed reckless homicide instruction. He concedes that his actions after the gunshot were intentional: he intentionally hastened Neville's death by taping the plastic bag over Neville's head and putting his hand over her mouth to restrict her airflow. But he argues that, based on the second coroner's testimony, the jury could conclude that the gunshot alone was enough to cause Neville's death. And if the jury determined that the gunshot alone killed her *and* that he accidentally shot Neville, the jury could properly determine he committed reckless homicide, not murder. This argument requires the Court to address an issue separate from Carter's state of mind—causation.

To be convicted of murder, a defendant's actions must be both (1) the actual cause and (2) the legal, or proximate, cause of the victim's death. *See Konkle v. State*, 253 N.E.3d 1068, 1083 n.2 (Ind. 2025). Actual cause "is usually established by demonstrating that the accused's conduct was an antecedent 'but for' which the result in question would not have occurred." 1 Wharton's Criminal Law § 6:1 (16th ed.). And proximate cause "requires that the harmful result in question be sufficiently related to the accused's conduct; if the defendant's causal contribution is too remote, the law will not condemn [him] for the resulting harm." *Id.*

Carter argues that the asphyxiation—his securing the bag over Neville's head—was not an actual or proximate cause of Neville's death because she would have died from the gunshot wound anyway. But Carter's argument is flawed. A defendant who kills an already mortally wounded victim cannot escape culpability by arguing that the victim was going to die anyway. 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(b) (3d ed.). In such a situation, "we can properly say that but for [the defendant's] conduct [the victim] would have lived," even if only for a short period of time; therefore, he "has caused [the victim's] death." *Id.* For this reason, it is well established that "one who hastens the victim's death is a cause"—both actual and proximate—of the victim's death. *Id.*; 40 Am. Jur. 2d Homicide § 14 (2025) ("[O]ne who inflicts injury on the deceased after the latter is mortally wounded by another may be guilty of homicide if the effect of the former's act hastened death."); *cf. Brackett v. Peters*, 11 F.3d 78, 80 (7th Cir. 1993) ("[A] murderer does not avoid

conviction by pointing out that his act was only one of many causes that concurred to bring about his victim's death. It is enough if his act was one of the causes—enough therefore if [his] assault made [the victim's] death more likely and if, but for the assault, she would not have died as soon as she did.").

Carter conceded at trial that he hastened Neville's death by asphyxiating her with the bag. Tr. Vol. 3 at 86 (defense counsel acknowledging in closing: "Did the asphyxiation make her die sooner? Yes, it did."). So it makes no difference whether there was a serious evidentiary dispute about Carter's state of mind when he shot Neville because all agree there was no serious evidentiary dispute about Carter's state of mind when he strangled Neville to death. That is, even if Neville would have died from the gunshot wound anyway, Carter's asphyxiation of Neville was still an actual and proximate cause of Neville's death. And because Carter also conceded that he acted intentionally when he secured the bag over Neville's head, there's no serious evidentiary dispute that he killed Neville intentionally.

Therefore, the trial court did not abuse its discretion in declining to give Carter's proposed reckless homicide instruction.

## II. There was sufficient evidence for the torture aggravator.

Carter next argues there was insufficient evidence to support the jury's finding that the State proved the torture aggravator. We review the sufficiency of the evidence supporting a statutory LWOP aggravator in the same way we review other sufficiency claims. *Ramirez v. State*, 174 N.E.3d 181, 200 (Ind. 2021). We consider only "the probative evidence and reasonable inferences supporting the verdict to determine whether there is substantial evidence on which a reasonable trier of fact could find the aggravator beyond a reasonable doubt." *Tate v. State*, 161 N.E.3d 1225, 1232 (Ind. 2021). We will not reweigh the evidence. *Id.*

To seek an LWOP sentence, the State must allege at least one statutory aggravator under Indiana Code section 35-50-2-9(b). And before that

sentence can be imposed, the jury must find that the State has proven beyond a reasonable doubt that at least one of the statutory aggravators exists and that the aggravator(s) outweigh(s) any mitigators. I.C. § 35-50-2-9(l). In this case, when it recommended LWOP, the jury found the State proved beyond a reasonable doubt the three aggravators the State alleged: (1) Carter was on probation for intimidation, a felony, at the time of the murder; (2) Carter was on probation for invasion of privacy, a felony, at the time of the murder; and (3) Carter tortured the victim. *See* I.C. § 35-50-2-9(b)(9)(C), (b)(11)(A). On appeal, Carter challenges only the sufficiency of the evidence supporting the torture aggravator.

The LWOP statute does not define torture. I.C. § 35-50-2-9(b)(11). But this Court has developed two "general guidelines for finding torture." *Tate*, 161 N.E.3d at 1232. Torture is "the intentional infliction of a prolonged period of pain or punishment for coercive or sadistic purpose" or "the gratuitous infliction of an injury substantially greater than that required to commit the underlying crime." *Id.* (citing *Nicholson v. State*, 768 N.E.2d 443, 447 (Ind. 2002)). Carter argues there is "no evidence of injury greater than that required to commit the underlying crime," and likewise "no evidence that Neville suffered a prolonged period of pain." Appellant's Br. at 17.

We are mindful that "evidence of intentional asphyxiation is not, in and of itself, evidence of torture, i.e., an intent to inflict intense physical pain." *State v. Langley*, 839 P.2d 692, 705 (Or. 1992) (emphasis omitted), *adhered to on reconsideration*, 861 P.2d 1012 (Or. 1993). That is because "[a]bsent other circumstances, murder by asphyxiation is not substantively different than murder by stabbing or shooting or bludgeoning." *Id.* In all those circumstances, "the victim may well suffer several minutes of pain and terror before succumbing." *Id.* Thus, in an asphyxiation case, the "focus of a torture inquiry is not on the defendant's intent to cause the victim's

death, but on the defendant's separate intent to cause intense physical pain." *Id.*[1]

Here, there is ample evidence to support the conclusion that Carter prolonged and gratuitously amplified Neville's pain, all for coercive and sadistic purposes. By Carter's own description, he began using the gun to intimidate Neville, threatening her and demanding that it was "time to tell the truth." State's Ex. 93 at 29:35–29:45, 30:00–30:25. After shooting her and then strangling her with his hands, he eventually suffocated her with a bag over her head, meticulously tightening it over her face with duct tape. As the trial judge described, the duct tape was a "tightly drawn, methodically placed device that resembled more of what you would expect to see on a person who had been wrapped like a mummy with duct tape." Tr. Vol. 3 at 157. These acts were not, as Carter claimed, "acts to end the suffering," but rather "acts to cause more suffering." *Id.* As Carter himself described, Neville died "choking and snarling and gasping and gagging." State's Ex. 7 at 1:13:40–1:14:00. And yet, after Neville died, Carter told his daughter that he did not regret killing her.

This evidence was sufficient for the jury to reasonably infer Carter was indulging a sadistic impulse. *See Tate*, 161 N.E.3d at 1233 (explaining a jury can "rely on the number and nature of the victim's injuries in finding the torture aggravator"); *State v. Johnson*, 743 S.W.2d 154, 156–57 (Tenn. 1987) (concluding there was sufficient evidence of torture where the defendant suffocated the victim for one to four minutes by forcing a plastic bag into her mouth), *cert. denied*; *Langley*, 839 P.2d at 705 (concluding there was sufficient evidence of torture for aggravated murder where the victim's body was "elaborately bound," including with "duct tape . . . wrapped three times around her head").

---

[1] Under Oregon law, prior to 2019, murder "in the course of or as a result of intentional maiming or torture of the victim" was aggravated murder, *e.g.*, Or. Rev. Stat. § 163.095(1)(e) (1992); *see Langley*, 839 P.2d at 705, for which a defendant could be sentenced to a life without parole sentence, *e.g.*, Or. Rev. Stat. § 163.105(1)(a) (1992). In 2019, the legislature reclassified murder "in the course of or as a result of intentional maiming or torture of the victim" as first-degree murder. Or. Rev. Stat. § 163.107(1)(e) (2020).

# Conclusion

For these reasons, we affirm Carter's conviction for murder and sentence of life imprisonment without parole.

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEY FOR APPELLANT
R. Patrick Magrath
West Sixth Law, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General

Megan Smith
Assistant Section Chief
Indianapolis, Indiana