Argued and submitted September 10, 1998, judgment of conviction and sentence of death affirmed February 4, 1999

# STATE OF OREGON,
*Respondent,*

*v.*

# MATTHEW DWIGHT THOMPSON,
*Appellant.*

## (CC9411-37406; SC S43235)

971 P2d 879

David E. Groom, Public Defender, Salem, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

VAN HOOMISSEN, J.

---

\* Kulongoski, J., did not participate in the consideration or decision of this case.

## VAN HOOMISSEN, J.

This is an automatic and direct review of a judgment of conviction and a sentence of death. ORS 163.150(1)(g); ORAP 12.10(1). Defendant seeks reversal of his convictions for aggravated murder, ORS 163.095, felony murder, ORS 163.115, and first-degree burglary, ORS 164.225. Alternatively, defendant asks this court to vacate his death sentence. We affirm the judgment of conviction and the sentence of death.

## I. FACTS

The jury found defendant guilty. We therefore view the evidence in the light most favorable to the state. *State v. Rose*, 311 Or 274, 276, 810 P2d 839 (1991).

About 10:30 p.m. on November 18, 1994, Andrew McDonald and his wife, Debra Oyamada, were at the Driftwood Tavern in Portland. Defendant and his companion, Paul Whitcher, entered the tavern and ordered a pitcher of beer. Oyamada was sitting at a video poker machine and McDonald was sitting at the bar. Defendant was wearing a plaid shirt. Defendant and Whitcher approached Oyamada. Defendant asked Oyamada if she was from "the 'samurai family' " or "from samurai blood." She responded, "As a matter of fact, yes, I am." Defendant continued, but Oyamada said she did not want to talk. Oyamada turned her back to defendant because she thought those were "weird questions" and that defendant was "overbearing." Defendant persisted, saying, "I need to know about it. I'm a warrior and I want to know about this." Oyamada replied that she did not want to talk about it. Defendant then sat next to Oyamada. She said, "You're sitting in someone else's seat." After that, defendant got up from the seat and started to walk toward the door. As they walked, McDonald approached defendant and Whitcher and said, "Please leave her alone, she doesn't want to talk about it." Pat Disciascio, the bartender, became concerned, and he directed defendant and Whitcher to leave the tavern. When defendant and Whitcher did not leave immediately, Disciascio said "Good night, you guys," and pointed toward the door. As defendant and Whitcher left the tavern, one of the two men said, "I feel like killing somebody tonight."

Defendant and Whitcher then stood outside, where defendant said to Whitcher, "I'm going to go back in there and kick that guy's ass." Defendant stated to Whitcher, "If we do this, you know, we're going to jail."

Between five and ten minutes after leaving, defendant ran into the tavern alone, grabbed McDonald from behind, began stabbing him, and dragged him outside. Oyamada tried to pry defendant off of McDonald. Defendant then turned on Oyamada, hitting her in the head, throwing her to the ground, and stabbing her in the head and neck. Bill Jones, another tavern patron, grabbed defendant. Defendant stabbed Jones six times. Defendant then ran away. Ambulances took McDonald, Oyamada, and Jones to the hospital. McDonald died as a result of his wounds.

Defendant and Whitcher went to defendant's grandmother's home, where defendant lived. Defendant introduced Whitcher to his grandmother, then she went to her room to sleep. About 1:30 a.m. on November 19, 1994, defendant's grandmother awoke and went downstairs because she heard a lot of noise. She saw Whitcher cleaning up broken glass and defendant cleaning grape juice off the rug. She asked Whitcher to leave. Defendant said that he was going to see that Whitcher got home safely, and the two men left the house. When defendant returned shortly, his grandmother was still cleaning grape juice. Defendant said he would clean the grape juice and told his grandmother to go to bed, which she did. Before she fell asleep, she heard the washing machine running.

About 1:30 a.m. on November 19, 1994, Sally Woolley called 9-1-1 to report that she heard loud, angry, male voices outside her home. Woolley reported that a man was lying face down in the street. Another man, wearing a plaid shirt, was kneeling over him and rolled him partially onto his side. The man in the plaid shirt rummaged through the other man's pockets, then ran away.

The police arrived. The man on the street was identified as Whitcher. He had been stabbed 16 to 20 times and was dead. One pocket had been turned inside out.

About 2:00 a.m. on November 19, 1994, the police found defendant walking nearby. He smelled of alcohol and was nervous and evasive. His shoes were untied and, although it was a cold night, he was sockless. One eye was swollen. The police thought that defendant might have witnessed Whitcher's stabbing and questioned him. After denying that he had been in an altercation, defendant stated that he lived nearby with his grandmother, but gave the police his mother's address. He denied ever having been arrested or being on probation. After a record check indicated that he had been arrested and that currently he was on probation, defendant was taken into custody.

The police first contacted defendant's mother, who stated that defendant did not live with her. She gave the police defendant's grandmother's address. The police contacted defendant's grandmother at her home. She invited the officers into her home and gave them permission to look around. Defendant's grandmother then led them to the washing machine in the basement and opened the lid. Blood was smeared on the outside of the machine. The washed clothing in the machine had stains consistent with blood. The grandmother told police that the clothing in the machine was defendant's. The state's criminologist concluded that the DNA recovered from the top of the washing machine, and from jeans, a shoelace, and a sock found in the washing machine, was consistent with Whitcher's.

At 12:30 p.m. on November 19, 1994, detectives returned to defendant's grandmother's home with a search warrant. After finding no weapons, the police left. They returned around 5:00 p.m. that day. With defendant's grandmother's consent, the detectives searched her basement. A detective found a bloody knife on a cross-beam and a blood-smeared wallet inside a wood stove. The knife was consistent with defendant's grandmother's description of a knife defendant owned. The state's criminalist concluded that the blood on the knife and wallet matched Whitcher's blood type.

## II. TRIAL

Defendant was charged in a 22-count indictment with the murders of Andrew McDonald and Paul Whitcher and with related crimes. The first 14 counts charged crimes

that occurred at the Driftwood Tavern in the late hours of November 18, 1994. The remaining counts charged crimes that occurred in the early morning hours of November 19, 1994. Defendant pled not guilty to all charges.[1] After a jury trial, defendant was convicted of aggravated murder (4 counts), murder (2 counts), felony murder (2 counts), first-degree robbery, first-degree burglary (2 counts), and first-degree assault (2 counts). After a penalty-phase proceeding, he was sentenced to death.[2]

Defendant assigns nine claims of error relating to the guilt phase and five claims relating to the penalty phase of his trial. He also contends that Oregon's death-penalty statute violates the Oregon and United States Constitutions.

## III. GUILT-PHASE ASSIGNMENTS OF ERROR

### A. *Pretrial motions*

1. Defendant contends that the trial court erred in denying his *pro se* motion for substitution of counsel.

Before trial, defendant informed the trial court that his counsel was "not working out." Specifically, he complained that: he had not yet received all police reports, his counsel took two to three weeks to return some phone calls,

---

[1] In her opening statement, defense counsel told the jury that the evidence would show that defendant killed McDonald and Whitcher but that he did not do so intentionally. Defense counsel asserted that the evidence at trial would show that defendant's conduct was the result of "heavy intoxication" and "probably an initial aggressive act and an attempt at self-defense on [defendant's] part."

"When you hear of the length of time it took for these acts to be committed, when you hear about the obvious intoxication of [defendant], when you hear about the lack of any discussion, the lack of any intentional actions on [defendant's] part regarding both Mr. McDonald and Mr. Whitcher, you can only arrive at a verdict less than aggravated murder and less than murder.

"* * * * *

"We feel, ladies and gentlemen, at the close of all the evidence you will hold [defendant] responsible for the death of these men, but not to the level, not to the degree that the District Attorney has indicted him for. * * *"

[2] Defendant was sentenced to death for aggravated murder on Count 1 (McDonald) of the indictment. Defendant also was sentenced to death for aggravated murder on Count 15 (Whitcher), said sentence to run consecutively to the death sentence imposed on Count 1. On Count 18, aggravated murder (Whitcher), and Count 19, aggravated murder (McDonald), defendant was sentenced to death, with each sentence to run concurrently with the death sentence imposed on Count 1.

his counsel should have attempted to "lower" the indictment, and that he had filed an action against his counsel under 42 USC § 1983 (federal civil action for deprivation of rights). After permitting defendant to explain his reasons for moving to substitute counsel, the trial court denied his motion. The court explained that defendant was being well represented by qualified attorneys and that he had not given the court sufficient grounds to change his counsel.

Later, defendant filed a *pro se* motion for substitution of counsel. Again, the trial court asked him to explain his complaints. He asserted that there was "no harmony" between him and his attorneys. The court then stated:

> "As you might recall, you and I have discussed this question on several occasions and on a couple of occasions I've gone over your complaints item by item and found them not to be a legal basis to grant your request.

> "Since I see nothing new, my ruling that I made in the past will stand and that is your motion for change of counsel is denied."

This court reviews a trial court's denial of a criminal defendant's motion for substitution of counsel for an abuse of discretion. *State v. Langley*, 314 Or 247, 258, 839 P2d 692 (1992), *opin adhered to* 318 Or 28, 861 P2d 1012 (1993).[3]

A trial court, presented with a defendant's request for substitution of court-appointed counsel, must assess the facts and determine whether the defendant's complaints are "legitimate." *Langley*, 314 Or at 257; *see also State v. Davidson*, 252 Or 617, 620, 451 P2d 481 (1969) ("a defendant has no

---

[3] Defendant also argues that the trial court's ruling violated his right to counsel under Article I, section 12, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution, as well as his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. However, defendant made no state or federal constitutional arguments at trial. *See State v. Moore*, 324 Or 396, 407, 927 P2d 1073 (1996) (refusing to address defendant's due process claim not raised at trial); *State v. Casterton*, 317 Or 202, 209, 856 P2d 616 (1993) (same). Moreover, on review, defendant has failed to present any thorough and focused constitutional analysis. *See State v. Montez*, 309 Or 564, 604, 789 P2d 1352 (1990) (refusing to address defendant's constitutional claim, because "a thorough and focused analysis" was not presented on review). Accordingly, we decline to address those claims.

right to have another court-appointed lawyer in the absence of a legitimate complaint concerning the one already appointed for him").

> "A 'legitimate complaint' about a court-appointed lawyer is one that is based on an abridgement of a criminal defendant's constitutional right to counsel. The right to counsel requires adequate performance of an appointed lawyer's professional assistance." *Langley*, 314 Or at 258 (footnote omitted).

*See also Krummacher v. Gierloff*, 290 Or 867, 872 n 3, 627 P2d 458 (1981) (explaining that court-appointed counsel "cannot always be 'effective,' but they must always be 'adequate' to the task").

■ Defendant does not claim that the trial court failed to make a factual assessment of the legitimacy of his complaints against his counsel. The issue is whether his complaints were "legitimate." The record shows that defendant did not assert facts that would have required the trial court to allow his motion for substitution of counsel. Rather, defendant's complaints indicate his general frustration with the pretrial process. For example, when pressed for specificity regarding his motion, defendant claimed that he "saw the bail hearing as just a chance for the district attorney to trump up charges to give witnesses practice testimony," and that he "was ignorant of these legal proceedings." Our review of the record does not reveal any other substantive basis for defendant's complaint about his counsel. We hold that the trial court did not abuse its discretion in denying defendant's motion for substitution of counsel.

2. Defendant next contends that the trial court erred by denying his motion to sever the counts related to the separate homicides in the indictment.

Before trial, defendant moved to sever the first 14 counts of the indictment, arguing that the state had not met the statutory requirements for joinder of the charges. He further argued that, even if those requirements had been met, he would suffer substantial prejudice if the counts were not severed.

The trial court reasoned:

"[ORS] 132.560[4] provides that two or more offenses may be charged in the same accusatory instrument if they are alleged to have been committed by the same person and are either of the same or similar character or are based on the same act or transaction. The allegations here meet both tests. All of these cases are either connected violent crimes of the same or similar character. They also are all part of the same act or transaction. The evidence in one under any standard would be admissible in trial in the other. In fact, it would be very difficult to understand the evidence in one of these crimes without hearing all of the evidence in the other crime. So the motion to sever is denied."

On review, defendant notes that the two homicides occurred on "separate calendar days," and argues that it "was unnecessary to refer to both homicides to tell the story of either homicide separately."[5] He argues that substantial prejudice resulted from the joinder, because "the presentation of both [homicides] would irrevocably influence the jurors as to their decision about each separate homicide."

Joinder of charges is governed by statute. ORS 132.560. A trial court's interpretation of a statute is reviewed for legal error. *Community Bank v. U.S. Bank*, 276 Or 471,

---

[4] ORS 132.560 provides, in part:

"(1) A charging instrument must charge but one offense, and in one form only, except that:

"* * * * *

"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged alleged to have been committed by the same person or persons and are:

"(A) Of the same or similar character;

"(B) Based on the same act or transaction; or

"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

"* * * * *

"(3) If it appears, upon motion, that the state or defendant is prejudiced by a joinder of offenses under subsection (1) or (2) of this section, the court may order an election or separate trials of counts or provide whatever other relief justice requires."

[5] In his brief, defendant acknowledges that the indictment contains a count in which an aggravating factor for the charge of aggravated murder involves the killing of two persons at or near the same time.

478, 555 P2d 435 (1976). Therefore, we review a trial court's determination that the state met the statutory requirements for joinder of charges for legal error. We also review a trial court's determination whether the facts stated in a defendant's motion to sever show the existence of prejudice for legal error. *State v. Miller*, 327 Or 622, 629, 969 P2d 1006 (1998).

In *Miller*, this court interpreted ORS 132.560(3) to determine what the legislature meant by the term "prejudice." This court stated:

> "The 'prejudice' standard in ORS 132.560(3) demonstrates that the legislature intended to authorize the court to safeguard the parties from potential injury or harm to their interests in a *fair trial*." 327 Or at 627 (emphasis in original).

This court assesses "fairness" in this context by "evaluating the specific interests of the parties at stake in light of our legal traditions and the applicable rules of trial procedure[.]" *Id.* The "actual or likely impairment" of a party's interest in "a trial conducted efficiently and in accordance with all applicable laws, including the constitutions, statutes, and rules of procedure and evidence, and in a decision based on a dispassionate consideration of the evidence rather than bias, emotion, or other improper criteria * * * constitutes * * * prejudice within the meaning of ORS 132.560(3)." *Id.* at 627-28.

■■ Defendant does not support his claim of error with arguments based on the facts in this case. Rather, he merely states that "where the offenses are distinct in time, place and evidence, defendant runs the risk that any adverse effect from one case will influence the jury's consideration of the other case." Defendant essentially argues that the jury's decision was not based on dispassionate consideration of the evidence relating to the McDonald and Whitcher murders. We agree with the trial court that the offenses are sufficiently similar to have been joined, and defendant has failed to demonstrate that he was prejudiced, within the meaning of ORS 132.560(3), by the trial court's denial of his motion to sever. We hold that the trial court did not err by denying defendant's motion to sever the counts in the indictment.

## B. *Trial motions*

1. Defendant contends that the trial court erred in overruling his objection to evidence that when he first was contacted by the police he denied that he previously had been arrested or was on probation.

The defense theory of the case was that defendant was too intoxicated to act voluntarily or to form the intent necessary to commit the acts with which he was charged. During trial, the prosecutor informed the court that the state intended to introduce evidence that when defendant first was contacted by the police he denied ever having been arrested or that he had been on probation. The prosecutor explained that the evidence was relevant to show that the defendant had not been so intoxicated that he could not form criminal intent to commit murder. The prosecutor stated that:

> "[I]t is the State's position that it shows that the defendant was able to process the information that he was able to in fact lie about it to try and protect himself and to get out of the clutches of the police, and it is therefore relevant."

Defense counsel objected to the evidence on the ground that it would be "unduly prejudicial" citing Oregon Evidence Code (OEC) 403.[6] The trial court overruled the objection and allowed the state to introduce evidence of defendant's denials, but the court ruled that no details about the arrests or probation would be admitted.

On review, defendant argues that the evidence was "overwhelmingly prejudicial." We review a trial court's decision to admit evidence challenged under OEC 403 for an abuse of discretion. *State v. Moore*, 324 Or 396, 407-08, 927 P2d 1073 (1996).

---

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

"Generally, evidence is *unfairly* prejudicial under OEC 403 if it appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact." *State v. Barone*, 328 Or 68, 87, 963 P2d 667 (1998); citing *State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996) (same) (emphasis in original).

■ The trial court considered the use for which the evidence was offered and limited its scope to the denials themselves. The trial court restricted the state from eliciting the details of arrest, conviction, or probation and the state properly restricted its questions to the denials. There is little reason to believe that evidence's probative value was outweighed by the danger of unfair prejudice. We conclude that that evidence had persuasive power to establish a fact of consequence, *i.e.*, whether defendant was able to form criminal intent near the time of the homicides. *See State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996) ("'Unfair prejudice' describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish a fact of consequence."). We hold that the trial court did not abuse its discretion in overruling defendant's objection to evidence that when he first was contacted by the police he had denied that he previously had been arrested or on probation.[7]

2. Defendant next contends that the trial court erred in denying his motions for judgments of acquittal on Counts 1, 5, 10, and 11 of the indictment.

Count 1 charged defendant with aggravated felony murder on the theory that he intentionally murdered McDonald in the course and furtherance of attempting to commit and committing first-degree burglary at the Driftwood Tavern. Count 5 charged felony murder, again with first-degree burglary at the tavern as the underlying felony. Count 10 charged first-degree burglary on the theory that defendant entered the tavern with intent to assault McDonald. Finally, Count 11 alleged that defendant committed first-degree burglary by unlawfully and knowingly entering and remaining in the tavern with a dangerous weapon with intent to assault McDonald. All four counts were premised on the state's theory that the bartender had excluded defendant from the tavern before defendant reentered and attacked McDonald.

---

[7] Defendant also argues that the evidence was not relevant and that it was inadmissible character evidence under OEC 404(3). Defendant also argues that he did not receive a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments. Those arguments were not presented at trial. Accordingly, we decline to address them. *Moore*, 324 Or at 407.

Following the state's case-in-chief, defense counsel moved for a judgment of acquittal on all counts. As to the four counts involving burglary, defense counsel argued that the state had presented insufficient evidence from which the jury could find that the bartender had excluded defendant from the tavern and, therefore, that no burglary had been committed as a matter of law. The trial court ruled:

"[W]hat I'm going to rule is that it's a fact question as far as whether there was an exclusion or simply a salutation. I paid very close attention to what everybody said about voice inflection, and particularly the bartender, and he clearly said that it was his attention [*sic*] to exclude them but that he didn't use those words. He thought that they knew that they couldn't come back. Because I originally had some real question when I heard the words used and heard Ms. Oyamada's recitation of that. But I'm going to submit that fact question. So I deny your special motion on that basis."

On review, defendant argues that the state presented insufficient evidence from which the jury could find that defendant had been excluded from the Driftwood Tavern and, therefore, the trial court erred in denying his motions for judgments of acquittal on Counts 1, 5, 10, and 11.

"We review challenges to the sufficiency of evidence solely to determine whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. Our decision is not whether we believe defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the jury to so find." *State v. Rose*, 311 Or 274, 281, 810 P2d 839 (1991).

ORS 164.225(1) provides:

"A person commits the crime of burglary in the first degree if the person violates ORS 164.215 and the building is a dwelling, or if in effecting entry or while in a building or in immediate flight therefrom the person:

"(a) Is armed with a burglar's tool as defined in ORS 164.235 or a deadly weapon; or

"(b) Causes or attempts to cause physical injury to any person; or

"(c) Uses or threatens to use a dangerous weapon."

ORS 164.215(1) provides:

> "Except as otherwise provided in ORS 164.255, a person commits the crime of burglary in the second degree if the person *enters or remains unlawfully* in a building with intent to commit a crime therein." (Emphasis added.)

ORS 164.205 provides, in part:

> "As used in ORS 164.205 to 164.270, except as the context requires otherwise:
>
> "* * * * *
>
> "(3) 'Enter or remain unlawfully' means:
>
> "(a) To enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or *when the entrant is not otherwise licensed or privileged to do so*[.]"[8] (Emphasis added.)

Several witnesses testified about the circumstances surrounding the bartender's exclusion of defendant from the tavern. Debra Oyamada testified that as defendant and Whitcher were heading toward the door, the bartender said: "Good night, you guys, and he was pointing at the door. Good night, you guys." Defendant and Whitcher then exited the Driftwood. Oyamada testified that "between five and ten minutes" after the time defendant and Whitcher walked out the door, defendant ran back inside the tavern and attacked McDonald.

Williams Jones, a tavern patron, testified:

> "A: I looked up just as [defendant and Whitcher] were going out because I heard Pat [Disciascio, the bartender] yelling, you know, good night, you know, get out.

---

[8] ORS 164.205 provides, in part:

"(4) 'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required.

"(5) 'Person in charge' means a person, a representative or employee of the person who has lawful control of premises by ownership, tenancy, official position or other legal relationship. It includes, but is not limited to the person, or holder of a position, designated as the person or position-holder in charge by the Governor, board, commission or governing body of any political subdivision of this state."

"Q: Did you see him pointing to the door?

"A: Yes."

John Earp, another tavern patron, testified:

"Q: All right. When—as a result of that exchange [between McDonald and defendant], did you hear Pat Disciascio say something to the young man?

"A: Absolutely. He pointed at the door and said, Good night fellas. And it was pretty clear to me that he was —

"* * * * *

"Q: When you heard Mr. Disciascio say that, and you indicated that he pointed with one of his arms, were you able to see where his arm was pointed?

"A: He was pointing at the door.

"Q: Is there any doubt in your mind what the intent was that Mr. Disciascio had in your mind what he was telling them?

"A: To leave."

On cross-examination, Earp testified:

"Q: Okay. Now, you testified on direct examination that you were able to hear the bartender say good night, boys, and point toward the door, is that right, sir?

"A: Correct.

"* * * * *

"Q: Anything else but good night, boys?

"A: I think he just said good night and pointed at the door —

"Q: Good night.

"A: —*in a very affirmative way*." (Emphasis added.)

Pat Disciascio, the bartender, testified:

"Q: Did you hear—were you watching this as it happened?

"A: Well, I became concerned because I heard—the talking was louder —

"* * * * *

"Q: Did you direct these men to leave?

"A: I did.

"Q: How did you do that?

"A: I asked them—they were—I just said keep it going, I'd like you to leave.

"Q: All right. Do you remember precisely the words you used in directing them out the door?

"A: Something like it's time to leave, let's keep it going, it's time to leave.

"Q: And did they respond to you?

"A. Yes."

On cross-examination, Disciascio testified:

"Q: * * * Okay. When you went to say good night boys they were already headed out the door, is that right, sir?

"A: Well, no, they'd stopped.

"Q: Okay. Where did they stop at?

"A: To talk to Debbie Oyamada.

"Q: Okay. After their contact with Ms. Oyamada, isn't it true that they were in the process of leaving—going toward the door when you assisted them out by—

"A: Yes.

"Q: —saying keep going, boys?

"A: Yes.

"Q: Now sir, you never told them they couldn't come back in, did you, sir?

"A: No, I didn't.

"Q: Okay.

"A: I just assumed they wouldn't."

Although the witnesses provided slightly different versions of the bartender's words and conduct, their testimony is consistent about his directions to defendant and Whitcher to leave the tavern. Although defendant claims

that "there was no fixed time that he was not supposed to re-enter" the tavern that night, we conclude that a rational jury could have found that the bartender intended to and did exclude defendant and Whitcher from the tavern at least for the remainder of that evening. Further, we find that the Jones and Earp testimony provided evidence from which a rational juror could find that a reasonable person would understand the bartender's words and conduct as an exclusion.

Additionally, there is evidence in the record from which a rational juror could find that defendant understood that the bartender intended to and did exclude them from the tavern for at least five to ten minutes. Brian Callicott was walking past the tavern on the evening of November 18, 1994. He testified that he saw two men, one in a leather jacket and the other in a plaid shirt, outside the tavern's door. He testified:

"A: Well, the one in the leather jacket kind of stood back as the other one with the plaid shirt went into the door and opened it, and then he turned around, you know, so I was standing there at this point, I mean, was kind of moving. But he opened the front door, and then he noticed that his friend was standing back, he didn't go with him.

"Q: So what happened?

"A: Well, he closed the door. He let the door close, and came back. He was saying something to his friend. I'm not sure exactly what he said at first and then, I mean, *and then he said, if we do this—something to this effect, if we do this, you know, we're going to go to jail*. And that was —

"* * * * *

"Q: I'm sorry. Who was it who said it?

"A: The guy in the plaid shirt.

"Q: All right. And he was saying—who was this directed to?

"A: To his friend with the leather jacket on.

"* * * * *

"Q: And you said you heard him speak. You heard him say the words about if we do this we're going to jail?

"A: Yeah, it was clear." (Emphasis added.)

We conclude that a rational jury accepting reasonable inferences could have found that, when the bartender said, "Good night, fellows," (or words to that effect) and pointed to the door, a reasonable person would have understood that he was not "licensed or privileged" to return to the tavern at the time that he did so. Thus, the evidence was sufficient to allow the jury to find defendant guilty of first-degree burglary beyond a reasonable doubt. Defendant does not explain why, as a matter of law, a reasonable person could not have understood the bartender's words and conduct to be an exclusion from the tavern for at least five to ten minutes, if not for the entire evening. We hold that the trial court did not err in denying defendant's motions for judgments of acquittal on Counts 1, 5, 10, and 11 of the indictment.[9]

3. Defendant next contends that the trial court erred by instructing the jury during its deliberations as to the definitions of "entering and remaining unlawfully," and about who had authority to exercise lawful control of the tavern premises.

At trial, the state requested Uniform Criminal Jury Instructions that define the phrases "enter or remain unlawfully" as used in ORS 164.205(3) and "person in charge" as used in ORS 164.205(5). However, the trial court inadvertently neglected to instruct the jury on those definitions. After retiring to deliberate, the jury sent a note to the trial court asking:

> "What constitutes being asked to leave a bar and what authority does the bartender have? What does he have to 'do or say—legally' to kick someone out."

Over defendant's objection, the court provided written copies of Uniform Criminal Jury Instructions on the phrases "enter or remain unlawfully" and "person in charge" to the jury.

---

[9] Defendant also argues that he "was denied his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution." Those constitutional arguments were not raised at trial and we decline to address them. *Moore*, 324 Or at 407.

On review, defendant does not argue that the additional instructions were incorrect.[10] He complains only about *when* they were given. Defendant contends that "to read these instruction at that time gave undue weight to these instructions, as opposed to the previous ones." Defendant further contends that, by giving the additional instructions, the trial court gave undue attention to the state's theory of guilt, thus buttressing the state's case at a critical time for the jury. The state responds that the court did not abuse its discretion in providing the definitions, that it would have been error not to have given the definitions,[11] and that the trial court properly instructed the jury to consider all of the instructions as a whole when it instructed the jury on the definitions.

 We review a trial court's ruling regarding jury reinstructions for an abuse of discretion. *State v. Flett*, 234 Or 124, 129, 380 P2d 634 (1963). For an instruction to constitute reversible error, it must have prejudiced the aggrieved party when the instructions are considered as a whole. *Martini v. Beaverton Ins. Agency, Inc.*, 314 Or 200, 211, 838 P2d 1061 (1992). This court has held that "cases should not be reversed upon instructions, despite technical imperfections, unless the appellate court can fairly say that the instruction probably created an erroneous impression of the law in the minds of the jurymen which affected the outcome of the case." *Waterway Terminals v. P. S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970).

██ When the court initially instructed the jury, it told the jury not "to give any instruction undue emphasis." It also instructed the jury that it was "to consider all of the instructions as a whole." The court repeated that admonition when it gave the additional instructions about which defendant complains in this assignment. Defendant has not demonstrated that the timing of the additional instructions prejudiced him when the instructions are considered as a whole.

---

[10] When the parties submitted their requested instructions to the trial court, defendant did not challenge the state's right to have the jury instructed on the definitions.

[11] The state relies on ORCP 59 B, which provides, in part, that "In charging the jury, the court shall state to them all matters of law necessary for their information in giving their verdict." ORCP 59 B is made applicable to criminal trials by ORS 136.330(1).

Nor has defendant shown that the additional instructions probably created an erroneous impression of the law. We hold that the trial court did not abuse its discretion in its timing of the jury instructions.[12]

4. Defendant contends that the trial court erred by accepting verdicts on Counts 15 and 22.

Count 15 of the indictment alleges that defendant

"did unlawfully and intentionally commit and attempt to commit the crime of Robbery in the First Degree and in the course of and in the furtherance of said crime which the said defendant was committing and attempting to commit, the said defendant personally and intentionally did cause the death of * * * PAUL R WHITCHER * * * by stabbing him[.]"

Count 22 alleges that defendant

"did unlawfully and knowingly use physical force upon Paul R Whitcher, and did use a dangerous weapon, to-wit: a knife, while in the course of committing and attempting to commit, theft of property, to-wit: a wallet, with the intent of preventing and overcoming resistance to the said defendant's taking of the said property[.]"

The jury returned verdicts of guilty on Counts 15 and 22. On being polled orally by the trial court, the jurors indicated that all 12 had voted "guilty" on Count 15 (aggravated felony murder), but one juror indicated that she had voted "not guilty" on Count 22 (robbery).

Defendant argues that those verdicts are "logically inconsistent," because defendant "simply could not have been guilty of felony murder based on a robbery verdict, if he was not guilty of robbery." The state responds that the fact that the juror voted not guilty on the *completed* charge of first-degree robbery is not inconsistent with a vote of guilty on the aggravated felony murder charge, which may be committed in the course of committing or *attempting* to commit first-degree robbery.

---

[12] Defendant also argues that the timing of the additional instructions violated his rights under the Fifth and Fourteenth Amendment to the United States Constitution. Defendant made no constitutional argument at trial and we decline to address it. *Moore*, 324 Or at 407.

██ ██ Whether verdicts are consistent is a question of law, thus the trial court's acceptance of the verdicts is reviewed for an error of law. *See State v. Mendez*, 308 Or 9, 12-14, 774 P2d 1082 (1989) (implicitly applying that standard).[13] If verdicts can be harmonized, they are not necessarily inconsistent. *Id.* at 14.

██ ██ The fact that a juror voted "not guilty" on the first-degree robbery count and "guilty" on the aggravated felony murder count based on that robbery count does not necessarily make those verdicts inconsistent. First-degree robbery requires the jury to find that the defendant committed the completed robbery. In contrast, aggravated felony murder (based on first-degree robbery in this case) does *not* require the jury to find that the defendant completed the robbery. A conviction for aggravated felony murder may be based on a jury's finding that the murder was committed in the course of or in furtherance of *attempting* to commit a listed felony (first-degree robbery in this case). ORS 163.115(1)(b). We conclude that the verdicts are not "logically inconsistent." We hold that the trial court did not err in accepting verdicts on Counts 15 and 22.[14]

## IV. PENALTY-PHASE ASSIGNMENTS OF ERROR

1. Defendant contends that the trial court erred by admitting evidence from his juvenile court record during the penalty-phase trial.

Before trial, the court sealed a file containing defendant's juvenile court records and social history. After defendant's convictions, the state sought to have those materials released to the parties for use during the penalty-phase proceedings. Defendant objected, contending the materials were not subject to *disclosure* for that purpose. Defendant relied on

---

[13] In *Mendez*, 308 Or at 14 n 7, this court noted that it is not clear that inconsistent verdicts provide a basis for reversal by an appellate court. Because we conclude that the verdicts here are not necessarily inconsistent, we do not address that issue.

[14] Defendant also argues that the trial court's ruling violated the Oregon Constitution as well as federal due process. Because defendant raises his state and federal constitutional claims for the first time on review, we decline to address them. *Moore*, 324 Or at 407.

ORS 419A.255, a statute that makes such records privileged. The trial court ruled:

> "And I'm going to release, having reviewed the entire juvenile [file] and finding that everything in it could arguably be relevant or to lead [to] relevant information and admissible information in this case, I'm going to release it to both sides.
>
> "* * * * *
>
> "So far as any documents might be *received into evidence*, we'll make a document by document decision as to whether those should be sealed *at the conclusion of the trial*." (Emphasis added.)

On review, defendant argues that the *admission* of evidence from his juvenile court record violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and, therefore, reversal is required.

■ At trial, defendant did not object to the *admission* of any evidence that may have been derived from defendant's juvenile court records.[15] Thus, he has not preserved the error he claims on review and, accordingly, this court will not address it. *See State v. Montez*, 324 Or 343, 356, 927 P2d 64 (1996) (citing *State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992) (an objection on one ground is not sufficient to preserve some other objection)). We hold that the trial court did not err in the manner argued by defendant.

2. Defendant next contends that the trial court erred in the penalty-phase proceeding by admitting state's Exhibit 85, a letter written by defendant. The letter describes defendant's plan to "hit [a guard] in the gut a few times * * * 'til he went out or stopped moving" and then to "break window [*sic*]" and escape from jail. Defendant objected, arguing that under OEC 403, the prejudicial effect of the letter outweighed its probative value. The trial court overruled defendant's objection, stating:

---

[15] Moreover, it is not apparent from the record that any information derived from defendants' juvenile court records in fact was admitted at the penalty phase.

"I have to feel that on this issue of the death sentence it certainly is much more probative than prejudicial. It goes to the issue of future dangerousness which is one directly, which is one of the questions that will be put to the jury, and I have to deny the objection."

On review, defendant argues that the letter "suggest[s] to the jury that defendant is a person of bad character" and that the letter "suggests bad actions or bad character evidence which * * * [does] not suggest future dangerousness." A trial court's ruling to admit evidence challenged under OEC 403 is reviewed for an abuse of discretion. *Moore*, 324 Or at 408.

We conclude that the letter, which detailed a plan to attack a guard and escape from jail, was probative of defendant's future dangerousness, a penalty-phase issue. ORS 163.150(1)(b)(B).[16] We hold that the trial court did not abuse its discretion in admitting state's Exhibit 85.[17]

3. Defendant next contends that the trial court erred in denying his motion for a mistrial, based on a witness's apparently inadvertent reference to an alleged sex abuse charge against defendant.

During the penalty phase, an intake worker from the State Office for Services to Children and Families stated that in 1985 her office had difficulty providing residential placement services for defendant because of "an allegation of a sex abuse issue." Defendant moved for a mistrial. The trial court denied the motion and instructed the jury that it should "disregard the statement completely," because there was "nothing to sustain any allegation of sex abuse against" defendant and that the witness's reference to sex abuse was

---

[16] ORS 163.150(1)(b)(B) provides that, in sentencing for aggravated murder convictions:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"* * * * *

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]"

[17] Defendant also raises claims of Fifth and Fourteenth Amendment due process violations for the first time on review. We decline to address those claims. *Moore*, 324 Or at 407.

"unfortunate." During the next recess, defendant renewed his motion for a mistrial. The trial court again denied the motion on the ground that, although the reference was an error, the court's jury instructions allayed any prejudice.

 Defendant argues that the rulings violated his right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution. We review a denial of a motion for a mistrial for an abuse of discretion. *See State v. Wright*, 323 Or 8, 12, 913 P2d 321 (1996) (deferring to the trial judge's discretion in denying a motion for a mistrial).

 The record shows that the prosecutor had instructed the witness not to mention the sex abuse allegation against defendant and that the witness's statement was inadvertent. Further, the trial court immediately gave a curative instruction. Jurors are presumed to follow a trial court's instructions. *State v. Walton*, 311 Or 223, 250, 809 P2d 81 (1991) (citing *State v. Smith*, 310 Or 1, 26, 791 P2d 836 (1990)). Defendant has not shown that the jurors who served in this case failed to follow the court's instructions. We find no prejudice to defendant. We hold that the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

4. Defendant next contends that the trial court erred in denying his motion to strike a portion of the prosecutor's penalty-phase rebuttal argument.

During the penalty-phase trial, defendant testified to the following:

> "Let me start by when I was first arrested, I talked to [defense counsel] and I told her that I just wanted to plead guilty. * * * I did not want a trial. That man wanted the trial.
>
> "* * * * *
>
> "A lot of things in this case were manipulated and promoted and pumped up. The families, they were told a lot of lies by that man for political gain or personal, I don't know. If there would have been some kind of reasonable charges or reasonable plea, something I could legally plead guilty to and get this all over with, I would have * * *."

In his closing rebuttal argument, the prosecutor stated:

> "As to his personal attacks against me, I want you to think about this, I want you to consider them, I want you to use your opportunity to consider them in assessing the probability for his committing violent acts in the future."

Defense counsel moved to strike that statement on ground that it was "improper." The trial court denied the motion.

■ On review, defendant argues that, "Clearly, the prosecutor misconstrued defendant's statement, and apparently his accompanying gestures, for his own benefit." He further argues that the prosecutor's statements prevented defendant from having "a fair consideration by the jury." The state responds that the prosecutor's statement was relevant to the jury's consideration of defendant's future dangerousness. ORS 163.150(1)(b)(B). Further, the state argues that defendant's telling the jury that the prosecutor had lied to the victims' families and had pursued the trial for political or personal gain *did* constitute a "personal attack." We review a trial court's ruling not to strike a portion of the prosecutor's argument for an abuse of discretion. *Smith*, 310 Or at 24. A trial judge may abuse his or her discretion if the denial violated a defendant's right to a fair trial. *Id.*

In *Smith*, this court stated:

> "Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial. These same principles apply to the determination of whether a defendant in a capital case is entitled to a new penalty phase." *Id.* (citation omitted).

In *Wright*, 323 Or at 12, this court considered whether the trial court erred in denying a motion for mistrial after a witness "glared" at the defendant. The trial judge stated that, in his observation of the incident, "it wasn't of sufficient magnitude to cause a mistrial or incite the jury[.]" *Id.* On review, this court reasoned that the case "presents a classic example of why this court defers to a trial court's assessment of the need for a mistrial in most circumstances:

The trial judge is in the best position to assess the impact of the * * * incident and to select the means (if any) necessary to correct any problem resulting from it." *Id.* (citations omitted).

■ The reasoning in *Wright* applies to a motion to strike as well. A trial transcript does not capture body language, voice inflection, or other subtle nonverbal cues that are part of direct communication. Although in this case, unlike in *Wright*, the trial judge did not explain on the record why he denied defendant's motion, we infer that the judge found that the prosecutor's remarks were not "improper." Our review of the record provides no clue as to whether defendant's tone of voice, facial expression, or gestures, if any, accompanying his statements, created an implicit threat that would be relevant to his future dangerousness. That is why this court defers to the trial judge's discretion. Here, we find no abuse of discretion by the trial judge's denial of defendant's motion to strike. At a minimum, defendant's allocution, read in context, indicates that defendant felt that the prosecutor had lied and had forced him to trial against his will. Defendant communicated those assertions to the jury in a manner that demonstrated some anger that a rational trier of fact could view to be a "threat" or a "personal attack." We conclude that the prosecutor's statements did not deny defendant his right to a fair trial, and we hold that the trial court did not abuse its discretion in denying defendant's motion to strike.[18]

5. Finally, defendant contends that the trial court erred in overruling his demurrer attacking the constitutionality of Oregon's death-penalty scheme. Defendant recognizes that his challenges to Oregon's death penalty have been rejected by this court in previous death-penalty appeals. *See, e.g., State v. Guzek*, 310 Or 299, 797 P2d 1031 (1990); *State v. Montez*, 309 Or 564, 789 P2d 1352 (1990); *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990). We decline to reconsider these issues. *See State v. Barone*, 328 Or 68, 98, 963 P2d 667 (1998) (declining to revisit issues previously decided); *State v.*

---

[18] Defendant also argues that the trial court's ruling violated his right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and that he did not receive due process of law. Those constitutional claims were not made at trial and we decline to address them. *Moore*, 324 Or at 407. Similarly, we do not address defendant's claim of prosecutorial misconduct, because it was raised for the first time on review.

*Hayward*, 327 Or 397, 414, 963 P2d 667 (1998) (same). We hold that the trial court did not err in overruling defendant's demurrer.

We have considered each of defendant's assignments of error and every argument made in support thereof. Any assignment of error or argument not discussed in this opinion either has been considered by this court previously and resolved against defendant or is not well taken. We find no error.

The judgment of conviction and the sentence of death are affirmed.