Submitted February 26, 2015, remanded for resentencing, otherwise affirmed June 8, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

FREDERICK LEE VIERRIA,
aka Frederick L. Vierra,
*Defendant-Respondent.*

Klamath County Circuit Court
1202192CR; A155681

379 P3d 667

Peter Gartlan, Chief Defender, and Elizabeth Daily, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Peenesh H. Shah, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

## DUNCAN, P. J.

In this criminal case, defendant appeals a judgment convicting him of one count of unauthorized use of a motor vehicle (UUV), ORS 164.135, and two counts of fleeing or attempting to elude a police officer, ORS 811.540, raising four assignments of error.[1] We reject defendant's second and third assignments of error, which relate to the trial court's admission of photographs of his tattoos, without further discussion. As explained further below, we also reject defendant's first assignment of error, in which he contends that the trial court abused its discretion by denying his motion for substitution of counsel. Finally, as to defendant's fourth assignment of error, we conclude that the trial court erred by imposing a sentence on the UUV conviction that exceeds the legal maximum. Accordingly, we remand for resentencing and otherwise affirm.

We begin with defendant's first assignment of error, in which he asserts that the trial court should have appointed substitute counsel at several points during the proceedings. The relevant facts are procedural. Defendant was charged with the crimes at issue here by information and, soon thereafter, by indictment, in September 2012, and Studenberg was appointed to represent him. In November, defendant wrote a letter to the court requesting that Studenberg be removed. At a hearing on that question, defendant rescinded his request, but, nevertheless, Studenberg felt that it was ethically necessary for him to withdraw.

Gourley was then appointed as defendant's counsel. By January 2013, numerous additional cases had been filed against defendant. In February, Gourley notified the court that he had an ethical conflict representing defendant and, as a result, he had to withdraw. The court then appointed Carter to represent defendant on all of his cases, and Carter entered into negotiations with the state. In March, Carter informed the court that he had represented someone who was a critical witness in one of defendant's cases;

---

[1] One of the counts of attempting to elude a police officer was for an attempt to elude with a vehicle, ORS 811.540(1)(b)(A), and the second was for an attempt to elude on foot, ORS 811.540(1)(b)(B). The judgment also dismissed one count of possession of methamphetamine, ORS 475.894. That disposition is not at issue on appeal.

accordingly, unless he was able to negotiate a settlement—and he anticipated that it would be "an all-or-nothing thing," that is, a settlement of all the cases or none—he would have to withdraw. Shortly thereafter, he withdrew and the court appointed Hendershott to represent defendant.

Hendershott was an "out-of-county" attorney appointed because defendant had been represented by or had conflicts with the regularly appointed attorneys for Klamath County. Hendershott often appeared by telephone. After two telephonic appearances in late March and early April, Hendershott appeared in person on April 15. He explained to the court that he was in contact with, and awaiting a settlement offer from, the prosecutor assigned to the case, and the record reflects that he had been in contact with defendant at least once by phone and once by letter. Defendant failed to appear for the April 15 hearing.

On May 6, Hendershott again appeared telephonically; defendant was present. Before the hearing, Hendershott's investigator met with defendant at the courthouse. During the hearing, Hendershott informed the court that he needed to discuss with defendant a conversation that he had had with the prosecutor the previous Friday; defendant and Hendershott made plans for defendant to call Hendershott upon returning to the jail.

In June, defendant again failed to appear at a hearing. In early July, additional charges were filed against defendant, and, although defendant wanted to plead guilty immediately, the court appointed Hendershott to represent defendant on the new charges. A week later, defendant was arraigned on the new charges. He reiterated that he wanted to plead guilty to those charges and stated that he did not want an attorney on them.[2] The court instructed defendant to speak to Hendershott, and defendant and Hendershott made plans for defendant to call Hendershott the next day.

On August 14, Hendershott moved to withdraw as defendant's attorney. In a declaration attached to the motion,

---

[2] The court's decisions with respect to those charges are not at issue on appeal; we include information about them only for context.

he explained, "The reason for this Motion is defendant has requested I file this motion. The defendant is aware that the decision whether or not to replace counsel is made by the court." On August 19, the court considered the motion at a hearing. The court asked Hendershott, "I understand that [defendant has] asked you to, for a different attorney, but do you have any ethical reason you can't represent him?" Hendershott explained that he believed he had no ethical conflict with defendant, but that he was obligated to file the motion to withdraw because defendant had requested it. The court also gave defendant the opportunity to explain why he no longer wanted Hendershott to represent him. Defendant explained as follows:

> "Well, for, for starters, the lack of him doing what a lawyer is supposed to with keeping with the attorney and client privileges where he speaks to the client about the case at hand, for one. For two, giving my—allowing me my, my constitutional rights here of the discovery and everything else. My * * * girlfriend, she contacts my attorney and asked him to provide me my discov—copies of my discovery, to come see me or to send an investigator.

> "I've been in jail 45 days; he hasn't even so much as come see me one time or even sent his investigator. If I wanted a fast and speedy trial, how he's going to prepare to even know what type, the case is about or how to go about defending me in it if he doesn't come and talk to me? I've got letters from witnesses that will, that can verify that I wasn't, that I didn't do the crime, and he don't even know about them because he hasn't even come to see me.

> "* * * * *

> "Right here in the letter my girlfriend writes on the 3rd of this, of August, she goes, glad to hear you're, you fired your lawyer. He's a piece of work. I called him and asked him everything you asked me to, I asked him to go see you or send his investigator, he said he didn't have the time because he had other cases, not just yours. And I asked him to send, send you all of your discovery and he said you were already provided with copies of all those papers. Okay. A copy of what the, the District Attorney and the State of Oregon is claiming is a crime that I committed is not discovery; far from it."

Defendant then moved to recuse the judge and invoked his right to a fast and speedy trial. Then he continued, "And, and also, you guys are invoking—you invoked my right to an attorney when I requested specifically that I didn't want one and you made me, which is against my constitutional right to have an attorney in the first place * * *."

Shortly thereafter, the court indicated to defendant that he needed to "go back with the officer," and the following exchange occurred:

"THE DEFENDANT: [Hendershott had] better not come see me or I'll punch him in his fucking face.

"THE COURT: Mr. Vierria?

"THE DEFENDANT: That's what I'm telling him right now.

"THE COURT: Mr. Vierria, sit down.

"THE DEFENDANT: There's a complete and entire breakdown—

"THE COURT: Mr. Vierria—

"THE DEFENDANT: —of the attorney-client privileges here and you're not even recognizing them.

"THE COURT: —sit down. Mr. Vierria, as—

"THE DEFENDANT: No, don't Vierria me. This guy's a joke. He hasn't represented me one bit."

The court held defendant in contempt of court and denied Hendershott's motion to withdraw.

A week later, the court held another hearing. All of defendant's cases had been reassigned to a new prosecutor, who explained that all previous settlement offers were withdrawn, nine or 10 new felony cases were about to be filed, and she wanted to try defendant's cases, starting with the case at issue in this appeal. She explained, "We can probably just start doing one [trial] a day for probably * * * three weeks * * *." The trial in this case was set for September 5.

On September 3, Hendershott moved for a continuance. In an attached declaration, he explained that eight new indictments had been returned and

"[t]he parties need more time to evaluate the big picture in the hope of resolving the entire collection of case[s]. In addition, defendant has written to the attorney for the state claiming he has witnesses and documentation relating to this case. He has not disclosed that information to me nor identified the witnesses in his letter to the state. Investigation of that issue is required."

The court noted that defendant had also filed a request for a different attorney and what the court understood as a separate motion to continue the trial. The court declined to rule on defendant's motion to continue (because he was represented by Hendershott), but granted Hendershott's motion for a continuance.

Then the court turned to defendant's motion for substitute counsel. The following discussion took place:

"[THE COURT]: Mr. Vierria, you do have a right to be represented by an attorney; you have a right to be represented by a court appointed attorney if you can't afford one. It's been determined that you are indigent and merit and qualify for a court appointed attorney. You don't get to pick and choose who your attorney will be. Mr. Hendershott has represented defendants in the State for a number of years, Indigent Defense Service has deemed him to be well qualified to represent people charged with matters such as you're charged with, as well as homicide cases. So, he's been deemed to be very well qualified to represent indigent defendants. If you insist on discharging him, you do so at the risk of representing yourself, because the Court will not just go through a list of attorneys until you get somebody you want. Again, he's a well-qualified attorney and he's been appointed by the Court to represent you in these matters. Do you understand what I'm saying, sir?

"THE DEFENDANT: Yeah, yeah, I understand very well what you're saying but, um, in rebut to that, I also do have a right to effective counsel. And when I sit 61 days in County jail and my attorney doesn't show up one time or doesn't do any investigation at all, and then at the last day wants to file a motion to continue. * * *

"* * * * *

"THE DEFENDANT: Why am I—why would he be filing a motion to continue for me without first, contacting me about this?

"THE COURT: You should discuss your matters in private with your attorney—

"THE DEFENDANT: Well, maybe I would if he would contact his client. I've been in jail 61 days, and he has yet to come see me. My wife-slash-girlfriend has been in contact with his office and himself requesting for him to send investigators, for him to come talk to me himself. And he told her, I will not; he's not the only client I have. In 61 days, I think he could have found time to make it over this mountain and to see his client. I have the right to be adequately represented and he has not in far been as such. So if I have to represent myself, I've got a better chance than with him.

"THE COURT: That—you may think so, Mr. Vierria, but that's not true.

"THE DEFENDANT: Well, at least when, when I go to do research on things, at least when I have witnesses that can be produced in Court, at least I go out and seek them; he don't even seek them. I've had a witness in this trial that was about to be set, I've had a witness since almost 60 days ago that was willing to testify in Court that they sold me the car and my attorney knows nothing of this because he can't even contact me, even though I told him about this over 35 days ago and asked him to send his investigator over to talk to the person while he was still incarcerated so he could get all his information so he could show up to Court when trial came. But my attorney failed to do so. He is inadequate."

The court declined to appoint substitute counsel; it noted that defendant could renew his request not to be represented by Hendershott, but that, if he did, "you will not have a court appointed attorney."

In late October, a week before trial, the prosecutor informed Hendershott that "the consolidated offer for all of the cases is now withdrawn" and that she intended to file additional witness-tampering charges based on defendant's recent conduct.

On the morning of trial, the state requested that defendant be required to wear a leg brace under his clothing during trial. In support of that request, the prosecutor recounted defendant's aggressive and threatening behavior toward, at different times, two judges and Hendershott.

That behavior included an incident in which, after the court refused to take Hendershott off the case, defendant spat in Hendershott's face, as well as two statements in which he said that he planned to "kick [Hendershott's] ass" when his restraints were taken off for trial. It also included an episode in which the court held defendant in contempt and, due to his behavior found it necessary to sentence him by video and mute the video monitor because of defendant's "foul language and his aggressiveness to the Court." Hendershott did not object to the state's request.

Also on the morning of trial, the court confirmed with Hendershott that he was willing to continue representing defendant, and Hendershott explained:

> "I'd be willing to attempt to do so; the decision to remove me from the case lies with the Court unless I'm in a situation where I have to withdraw. But other than ethical reasons to withdraw, [defendant's] conduct makes him virtually impossible to work with, I don't think he would be happy and able to work with anyone who didn't do precisely what he wants."

In response to the court's further inquiry, he said:

> "Sometimes situations arise, conflicts of interest or what-have-you, that would, that I would be required to withdraw. There is no conflict of interest in this case; there's a client the Court has observed and I think you can understand that this relationship with lawyers personally is something that isn't going to work out for anybody. There may be somebody out there that can deal with him; I don't know who it is."

The court found that defendant "has engaged in conduct which I believe indicates that he's being obstreperous and trying to do everything he can not to allow this case to proceed as well as his other cases[.]" The court accepted Hendershott's statement that he could continue to represent defendant and allowed the state's request for defendant to wear a leg brace during trial.

The case proceeded to trial. On the UUV charge, the defense theory was that defendant lacked knowledge that he was using the vehicle without consent of the owner. In support of that theory, defendant testified that he had

arranged to buy the vehicle—a BMW convertible—from a man named Manuel for $1,000. After inspecting the car by flashlight in the very early hours of the morning, he testified, he had paid Manuel a few hundred dollars in cash and drugs as a deposit, in exchange for which he had received the car, the keys, the registration (which did not identify Manuel as the registered owner), and the right to take the car for a test drive, which he had been doing when he was apprehended by the police.

Hendershott subpoenaed a witness, Enos, who was prepared to testify that he witnessed the transaction between Manuel and defendant. Enos arrived on the morning of trial, but when he was called, in the afternoon, he had left and the telephone number that he had provided to Hendershott proved to be disconnected. In Enos's absence, the state and the defense stipulated to the admission of a notarized statement by Enos, made while he and defendant were incarcerated together, saying that he had seen Manuel offer to sell the car to defendant. On cross-examination, defendant testified that he had requested similar letters from numerous people who had also witnessed the transaction, but that Enos was the only one who had written one. The jury convicted defendant of the three counts at issue.[3]

Defendant asserts that the trial court erred in declining to appoint substitute counsel at three points: at the hearing on August 19, when the court denied Hendershott's motion to withdraw; at the hearing on September 5, when the court denied defendant's request for substitute counsel; and on the day of trial, when the court confirmed with Hendershott that he would continue to represent defendant. The state responds that the only one of those three points at which defendant requested substitute counsel, and, accordingly, the only point as to which we should consider defendant's argument, is the September 5 denial of defendant's request for substitute counsel.

To the extent that defendant argues that the court erred in failing, *sua sponte*, to require Hendershott to withdraw and appoint new counsel in his place on the morning

---

[3] The prosecutor moved to dismiss the possession of methamphetamine count after the trial began.

of trial, we reject that argument without further discussion. Moreover, we need not decide whether defendant preserved a request for substitute counsel on August 19, because the information before the court at that point was similar to the information before the court when it denied defendant's request for substitute counsel a little more than two weeks later, on September 5. As we will explain, the court did not abuse its discretion in declining to appoint substitute counsel.

Our evaluation of a court's treatment of a defendant's request for substitute counsel takes place in the context of Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. Those provisions guarantee a defendant the right to counsel. If the defendant cannot afford to hire a lawyer, one will be appointed for him or her. *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005). A defendant's constitutional rights are rights to adequate and effective assistance of counsel; thus, "the defendant's right is not just to a lawyer in name only, but to a lawyer who provides adequate assistance." *Id.*

A defendant has "'no right to have another court-appointed lawyer in the absence of a legitimate complaint concerning the one already appointed for him.'" *Id.* at 523 (quoting *State v. Langley*, 314 Or 247, 257, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) (internal quotation marks omitted)). "A 'legitimate complaint' about a court-appointed lawyer is one that is based on an abridgement of a criminal defendant's constitutional right to counsel." *Langley*, 314 Or at 258. A trial court's determination of "the legitimacy of any complaint about appointed counsel is case—and fact—specific, and it leaves to the trial court the task of weighing whatever the defendant puts before that court in light of all the other known circumstances, such as the judge's own personal observations of the performance of counsel at trial." *Smith*, 339 Or at 525; *see also id.* at 531 (defendant's generalized complaint that counsel would not provide fair representation was not legitimate where court stated belief, based on personal knowledge, that counsel was a very good lawyer); *State v. Johnson*, 340 Or 319, 349, 131 P3d 173, *cert den*, 549 US 1079 (2006) (defendant's complaints about counsel did not necessitate substitution of

counsel because they concerned strategic decisions that were counsel's to make); *State v. Thompson*, 328 Or 248, 255, 971 P2d 879, *cert den*, 527 US 1042 (1999) (complaints against counsel that merely demonstrate general frustration with the pretrial process are not legitimate); *Langley*, 314 Or at 258 (loss of confidence in counsel and disagreement with counsel's approach to matters of strategy do not necessitate substitution of counsel).

On appeal, defendant argues that his complaints that Hendershott had not met with him or investigated the case were legitimate because, under the circumstances, any attorney providing adequate assistance would have met with defendant and begun an investigation before September 5, when the court considered defendant's request for substitute counsel. Ultimately, defendant argues, "the record does not establish that defendant's attorney met with defendant, discussed the case with him, conducted an investigation, or prepared more than a minimal defense."

We disagree with defendant's view of the record. Given the information that appears in the record, none of the complaints that defendant cites on appeal were legitimate. Although defendant repeatedly complained that Hendershott had not met with him in person, the record reflects that Hendershott and defendant were in communication by telephone and, on at least one occasion, by letter.[4] Likewise, defendant's repeated contention that Hendershott had refused to send his investigator to meet with defendant is belied by the record, which reflects that defendant met with Hendershott's investigator at least once before September 5—specifically, on May 6. Thus, the trial court could reject, as matter of fact, defendant's complaints about Hendershott's failure to meet with him or send his investigator.

Regarding defendant's assertion that Hendershott had failed to contact witnesses, we note that, at the September 5 hearing, defendant complained both that

---

[4] Defendant does not argue that it was imperative that Hendershott meet with him in person, rather than communicating by letter and by telephone, in order to provide adequate assistance, and, under these circumstances, we do not perceive any reason why that should be the case.

Hendershott did not know of the witnesses because he had not met with defendant and that defendant had told Hendershott of the witnesses 35 days earlier, but Hendershott had not investigated. Thus, defendant's statements were inconsistent as to whether he had told Hendershott of his witnesses, and defendant never asserted that he had provided Hendershott the information necessary to investigate them—for example, their identities. We also note that, in support of his motion for a continuance, which was dated September 3, Hendershott stated that he had just learned that defendant had written the state claiming that he had witnesses and documentation, but that defendant had not disclosed the witnesses to him, so he needed additional time to investigate. Given the information before it, the trial court could conclude that defendant's complaints about Hendershott's investigation did not justify substitution of counsel. Moreover, the fact that Hendershott did subpoena Enos to testify, and that Enos actually came on the morning of trial, suggests that, even if there was delay in Hendershott's investigation, the decision to delay the investigation was not unreasonable; Hendershott was able to locate and subpoena defendant's witness and to present defendant's defense at trial.[5]

Given that record, we conclude that, in declining to appoint substitute counsel, the trial court weighed what defendant put before it "in light of all the other known circumstances" and decided that "defendant had not demonstrated a legitimate reason for the court to appoint substitute counsel." *Smith*, 339 Or at 525, 531. Under these circumstances, that was not an abuse of discretion.

We turn to defendant's fourth assignment of error, that the trial court's sentence on the UUV conviction exceeds the legal maximum. On the UUV conviction, the trial court imposed a sentence of 30 months' incarceration followed by 36 months' post-prison supervision. The judgment classified the UUV conviction is classified in crime seriousness

---

[5] Defendant does not identify, and we do not perceive, any way in which an earlier investigation would have made it more likely that Enos would have remained at the courthouse to testify when he was called. Nor does defendant suggest that earlier investigation would have yielded other favorable evidence.

category 3. *See* OAR 213-017-0009(14). Accordingly, as the state concedes, under OAR 213-005-0002(2)(a), the court was permitted to impose only one year of post-prison supervision. Although defendant's claim of error was not preserved, the error is plain. *See State v. Young*, 249 Or App 597, 599-600, 277 P3d 645 (2012) (trial court committed plain error by imposing five years of post-prison supervision on crimes for which OAR 213-005-0002 allowed only three years).

Defendant contends that the trial court also plainly erred in imposing the sentence it did because the combined terms of imprisonment (30 months) and post-prison supervision (36 months) exceed the statutory maximum indeterminate sentence of five years, or 60 months. ORS 164.135(2) (UUV is a Class C felony); ORS 161.605(3) (maximum indeterminate sentence for a Class C felony is five years). We agree. *See Young*, 249 Or App at 600 (trial court committed plain error where combined terms of incarceration and post-prison supervision for Class C felonies exceeded five years).

For the reasons cited in *State v. Hall*, 256 Or App 518, 519, 301 P3d 438, *rev den*, 354 Or 148 (2013), we exercise our discretion under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991), to correct the sentencing errors.

Remanded for resentencing; otherwise affirmed.